[Crim. No. 24237. Feb. 2, 1987.]

In re FERNANDO A. JACKSON on Habeas Corpus.

COUNSEL

Donald Specter, under appointment by the Supreme Court, for Petitioner.

John K. Van de Kamp, Attorney General, Ann K. Jensen, Kenneth C. Young, Morris Lenk and Paul D. Gifford, Deputy Attorneys General, for Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Respondent.

OPINION

THE COURT.* —We granted a hearing to determine whether either federal or state due process requires state prison hearing officers to interview confidential informants in camera before finding an accused prison inmate guilty of a disciplinary violation solely on the basis of confidential information.

Prison officials regularly depend on confidential informants to identify prison rule violators. While stressing the paramount need to rely on such informants as a source of information, these officials stress an equal need to maintain confidential the identity of those informants: to do otherwise, they claim, would subject informants to violent retaliation and hence dry up that crucial information source. Inmates, on the other hand, stress the opportunity for arbitrary and unfair deprivation of liberty interests resulting from a system that depends heavily on secret informants. This case forces us to examine the procedure required by the federal and state Constitutions

---

*Before Broussard, Acting C. J., Mosk, J., Lucas, J., and Panelli, J.

in order to accommodate both prison officials' interests in operating secure institutions and inmates' interests in fair disciplinary hearings.

Treating this petition for a writ of habeas corpus as a motion for declaratory relief[1] the superior court found (i) prison officials' "current procedures and practices when disciplinary charges are based on confidential information" violate both state and federal due process guarantees; (ii) providing "an in camera hearing at which the hearing officer may test the veracity of the source" would lead to more accurate determinations without unduly burdening prison security interests; and therefore (iii) whenever an inmate is accused of a prison rule violation based "solely on a confidential source(s) ... [an] in camera test must be conducted" before the inmate may be found guilty of a disciplinary charge.[2]

We reverse the judgment of the superior court. We conclude the proposed in camera procedure is not currently required by the due process clause of the federal Constitution. Nor, absent sufficient evidence of the proposed procedure's feasibility, will we conclude that in camera review of confidential informants is required under our state due process clauses. In the absence of such evidence, we hold the current administrative regulations, which require a hearing officer "personally" to make a finding on the informant's reliability and truthfulness, meet due process requirements so long as there exists in the disciplinary record information (confidential or otherwise) on which a reviewing court can conclude the hearing officer actually made a reliability and truthfulness determination, and that the determination is supported by evidence.

---

[1] Jackson was found guilty of a prison rule violation (15 Cal. Admin. Code, tit. 15, § 3005, subd. (b) ("force and violence")) on the basis of three confidential informants' statements. After exhausting his administrative remedies he petitioned the superior court for a writ of habeas corpus challenging, inter alia, the use of confidential informants in the hearing process. The court issued an order to show cause and eventually granted the petition, ordering Jackson be afforded a new disciplinary hearing and that the hearing officer interview the confidential informants in camera to establish their reliability. Thereafter the prison officials conducted a new hearing after which it was determined the confidential information did not support the charges. The Attorney General moved for reconsideration of the court's order, arguing the court had improperly expanded inmates' disciplinary hearing due process rights. Jackson filed a response in which he noted that although the issue was moot as to him, the issue was of continuing importance to all state prisoners and hence deserved to be resolved by declaration. (See *In re Davis* (1979) 25 Cal.3d 384, 387 [158 Cal.Rptr. 384, 599 P.2d 690]; *In re Brindle* (1979) 91 Cal.App.3d 660, 669-670 [154 Cal.Rptr. 563]; *In re Carr* (1981) 116 Cal.App.3d 962, 964, fn. 1 [172 Cal.Rptr. 417].) In support of his position that in camera review is both required and feasible, Jackson attached three declarations and the People attached opposing declarations.

[2] The People's application for a stay of the trial court's order was denied by the Court of Appeal, "Appellant having failed to make a sufficient showing."

## I. FEDERAL DUE PROCESS

The United States Supreme Court has implicitly rejected the notion that federal due process requires in camera "reliability testing" of confidential informants in prison disciplinary hearings. (*Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963].) Over Justice Marshall's dissent—in which he advocated in camera review of confidential informants (*id.*, at p. 590 [41 L.Ed.2d at pp. 970-971])—the *Wolff* majority observed that legitimate institutional concerns (primarily, preservation of order within prisons and the need to both encourage and protect confidential inmate informants) mandated that only minimal due process safeguards be afforded inmate disciplinary defendants. Such a defendant has a right to (i) advance written notice of the claimed prison rule violation; (ii) a written statement by the factfinder as to the evidence relied on and the reasons for the disciplinary action; and (iii) a limited right to call witnesses and present documentary evidence in his defense, unless doing so would create risks to institutional security. (*Id.,* at pp. 563-567 [41 L.Ed.2d at pp. 955-957]; see also *Baxter* v. *Palmigiano* (1976) 425 U.S. 308, 321 [47 L.Ed.2d 810, 823, 96 S.Ct. 1551].) The *Wolff* court specifically held due process did not entitle inmates facing disciplinary charges to confront or cross-examine those who furnish evidence against them: "The better course at this time, in a period where prison practices are diverse and somewhat experimental, is to leave [those] matters to the sound discretion of the officials of state prisons." (418 U.S. at p. 569 [41 L.Ed.2d at p. 958].) The court emphasized that its limited list of inmate-due-process protections was "not graven in stone. As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this court." (*Id.,* at p. 572 [41 L.Ed.2d at p. 960].)

Seizing on these latter statements, Jackson claims the future is now, and that federal due process standards recognize today what Justice Marshall advocated in dissent 12 years ago. Neither his cited federal or state cases, nor his other authorities, support this view.

It is true that two cases, *Palmigiano* v. *Baxter* (1st Cir. 1973) 487 F.2d 1280, 1290, reversed on other grounds 425 U.S. 308 [47 L.Ed.2d 810, 96 S.Ct. 1551], and *Clutchette* v. *Procunier* (9th Cir. 1974) 497 F.2d 809, 819-820 reversed on other grounds *sub nom. Baxter* v. *Palmigiano, supra,* 425 U.S. 308, strongly suggested federal due process required disciplinary boards to determine confidential informants' reliability in camera, but both cases predate *Wolff, supra,* 418 U.S. 539.[3]

---

[3] Moreover, neither case addresses whether, in the prison context, such in camera hearings would be feasible. Jackson also cites *Birzon* v. *King* (2d Cir. 1972) 469 F.2d 1241, 1244-1245, which is doubly distinguishable: not only does *Birzon* predate *Wolff,* but it concerns a parole revocation hearing, to which an inmate is afforded greater due process protections.

The federal cases decided since *Wolff* give no indication that in camera review is now required by federal due process. For example, the First Circuit, in *McLaughlin* v. *Hall* (1975) 520 F.2d 382, 385 (in an opinion by Chief Judge Coffin, author of *Palmigiano, supra,* 487 F.2d 1280), held that in light of *Wolff* it could not be said an in camera hearing was required. The Third Circuit, in *Helms* v. *Hewitt* (1981) 655 F.2d 487, 503, reversed on other grounds 459 U.S. 460 [74 L.Ed.2d 675, 103 S.Ct. 864], held that an inmate is denied due process if disciplined on the basis of confidential informant hearsay when the hearing board has "no basis for an independent assessment of the informant's credibility . . . ," but nowhere suggested an in camera interview of the informant was necessary to accomplish that purpose. In *Smith* v. *Rabalais* (1981) 659 F.2d 539, 546, the Fifth Circuit held, over the inmate's claim that an in camera hearing was required, that due process was satisfied by the disciplinary board's open hearing interview of the reporting guard.

In a series of cases the Seventh Circuit has come to the same conclusion. *McCollum* v. *Miller* (1982) 695 F.2d 1044, 1049, held an inmate's due process rights were violated inter alia by inadequate notice of the disciplinary charges against him, and remanded for testimony on the feasibility of extending to the inmate further safeguards—among them, in camera interviews of those who informed against him.[4] The next year the same court affirmed disciplinary findings in a consolidated appeal, holding there was no need under the circumstances for the hearing board to interview the *investigating officer* at all; the court said nothing about an in camera interview of the *confidential informant*. (*Jackson* v. *Carlson* (1983) 707 F.2d 943, 948.) Later, the same court in *Dawson* v. *Smith* (1983) 719 F.2d 896, 899, affirmed disciplinary findings on the basis of its own "judicial in camera" review of confidential reports and materials from which, the court concluded, the federal magistrate properly found that confidential information against the disciplined inmate was reliable. Most recently, citing *McCollum, Jackson,* and *Dawson,* the Seventh Circuit affirmed disciplinary findings based, inter alia, on its review of confidential reports from which, it held, the disciplinary board could properly have determined the confidential

---

[4] The court immediately thereafter noted: "Maybe that is too dangerous. Maybe the prison grapevine is so efficient that [inmate defendant] would learn who had been interviewed by the Committee—or maybe, whether or not it is that efficient, informants would be afraid to give testimony other than through the investigator. Cf. *Wolff* v. *McDonnell, supra,* 418 U.S. at 568, 94 S.Ct. at 2980. You need a better feel for Marion [Penitentiary] than we have to make judgments in these sensitive matters; and they happen to be matters of life and death. [¶] Thus, while we believe that [inmate] did not receive the process he was due under the Fifth Amendment, we do not know how much more process he could have been given without jeopardizing the lives, as well as the willingness to inform, of other inmates. We therefore remand . . . for a hearing in the district court at which officials of Marion can testify on the feasibility of the various procedural safeguards discussed in this opinion." (695 F.2d at p. 1049.)

information to be reliable. (*Mendoza* v. *Miller* (1985) 779 F.2d 1287, 1294-1296.) Again, the court in no way indicated that federal due process required the hearing board to interview the informant in camera.

Finally, the Eleventh Circuit has held that an in camera interview of the informant—although an option to be used at prison officials' discretion—is not required. (*Kyle* v. *Hanberry* (1982) 677 F.2d 1386, 1390.) Instead, the court held due process requires the disciplinary board (i) make a good faith effort to determine a confidential informant's credibility, and (ii) make a record from which a reviewing tribunal can reasonably conclude the board "undertook such an inquiry and, upon such inquiry, concluded that the informant was reliable." (*Ibid.*)[5]

State court interpretations of both the federal and respective state Constitutions track the federal circuit court cases. *Homer* v. *Morris* (Utah 1984) 684 P.2d 64, 68, followed the standard set out in *Kyle, supra,* 677 F.2d 1386, holding the record must contain reasons from which the disciplinary board could conclude the informants were reliable. The court did not suggest however, that the board must interview any informant in camera.[6] Iowa cases are similar: for example, in *Niday* v. *State* (1984) 353 N.W.2d 92, 93-94, the disciplinary board prepared a confidential file of the confidential informants' written statements, which file was made available for the court's later in camera inspection. Reviewing those documents, the state supreme court held the disciplinary committee had before it adequate information on which to base its decision that the confidential information was reliable. Nowhere did the court suggest due process required an in camera interview of the informants themselves. (See also *Wilson* v. *Farrier* (Iowa 1985) 372 N.W.2d 499, 502; *Fichtner* v. *Iowa State Penitentiary* (Iowa 1979) 285 N.W.2d 751, 759.)

In *Casper* v. *Marquette Prison Warden* (1983) 126 Mich.App. 271 [337 N.W.2d 56], the court held minimum due process requires that "[t]here must be some information on the record to convince an appellate tribunal that the disciplinary committee" "establish[ed] in good faith to its own satisfaction the credibility and reliability of an informant" (citing *Kyle, supra*), but specifically held: "[t]his does not require the informant himself to be brought before the committee." (*Id.,* at p. 58.) The Supreme Judicial Court of Massachussetts, in *Nelson* v. *Commission of Correction* (1983) 390 Mass. 379 [456 N.E.2d 1100], held state disciplinary regulations violated inmates' due

---

[5] See also *Finney* v. *Mabry* (E.D.Ark. 1978) 455 F.Supp. 756, 768-769 (determinations of an informant's veracity cannot be delegated to the reporting guards, but must be made, based on evidence, by the prison disciplinary board).

[6] In *Homer* the disciplinary committee did "privately review[ ] information the *investigating officer* provided to the committee." (*Id.,* at p. 68, italics added.)

process rights, *not* because the relevant regulation provided the "board shall not be required to interview the informant in person" (*id.,* at p. 1108, fn. 16), but because the regulations permitted disciplinary findings without requiring the board to determine confidential informant reliability consistently with *Helms* v. *Hewitt, supra,* 655 F.2d 487, and *Kyle, supra,* 677 F.2d 1386. (*Nelson, supra,* 456 N.E.2d at pp. 1107-1110.) Recently, citing *Nelson,* the same court upheld disciplinary findings because, inter alia, "the testimony of the reporting officer as to specific factual information he received from the informants" supported the board's determinations. (*Murphy* v. *Superintendent, Mass. Correctional* (1986) 396 Mass. 830 [489 N.E.2d 661, 663].)

The Supreme Court of Oregon, in *Shumway* v. *Oregon State Peniten., Corr. Div.* (1983) 294 Ore. 462 [657 P.2d 686], also reversed disciplinary findings for *Helms-Kyle* reasons: nothing in the record indicated the board had made its own finding that the informant was reliable; instead, the board had "delegated" its duty to the charging officer, whose conclusory affirmation of the informant's reliability was apparently accepted by the board. Again, the court nowhere suggested that an in camera interview of the informant by the board was required. In *Avant* v. *Clifford* (1975) 67 N.J. 496 [341 A.2d 629, 646-649], the court affirmed an inmate's disciplinary finding after reviewing the state's stringent regulations and imposing additional requirements, but again, nowhere suggested that state or federal due process required the in camera procedure suggested here.

The New York cases are in accord. It is true, as defendant observes, that in one case (*Alvarado* v. *Le Fevre* (1985) 111 App. Div.2d 475 [488 N.Y.S.2d 856]), the court reversed disciplinary findings while stating, "[w]e can perceive no reason in this case why the hearing officer could not have personally interviewed the inmate informants in camera ...." (*Id.,* at p. 857.) Defendant, however, fails to note that subsequent cases by the same court have made clear *Alvarado* stands merely for the proposition that confidential information cannot be used when "the record reveal[s] ... the hearing officer had no basis for a determination of the informants' credibility." (*Harris* v. *Coughlin* (1986) 116 App.Div.2d 896 [498 N.Y.S.2d 276, 277].) In both *Harris* and *Smith* v. *Le Fevre* (1986) 116 App. Div.2d 782 [497 N.Y.S.2d 174, 175], the court affirmed disciplinary hearings, despite the fact that confidential informants had not been interviewed in camera. The *Harris* court noted the record contained evidence from which the hearing officer could independently assess the informant's credibility, and the *Smith* court explicitly held the hearing officer's failure to interview the confidential informants denied the defendant no constitutional right.

Finally, *State* v. *Dept. of Health & Social Ser.* (1983) 115 Wis.2d 363 [340

N.W.2d 194], involved regulations that, inter alia, (i) apparently *permit* hearing officers to interview—presumably in camera—confidential informants and (ii) require confidential informant "statements" to be corroborated *and* under oath. The court reversed disciplinary findings because neither the corroboration nor the oath condition was met. The court nowhere suggested the regulation was deficient in merely *permitting,* rather than requiring, in camera interviews of confidential informants. (*Id.,* at pp. 196-197.)[7]

Nor do secondary authorities, many of which have been cited to us by Jackson, support his claim that federal due process now *requires* the procedure advanced here. At most, these authorities—in conclusional terms, and without discussing the feasibility of such a practice—merely state that in camera review of confidential informants would be "preferable," "helpful," "should be considered," and would lead to "more accurate results." (See Merritt, *Corrections Law Developments: The Use of Informants in Prison Discipline* (1982) 18 Crim. L. Bull. 451, 456; Jacob & Sharma, *Disciplinary and Punitive Transfer Decisions and Due Process Values in the American Correctional System* (1982) 12 Stetson L.Rev. 1, 98, 108; Note, *The Fourteenth Amendment and Prisons: A New Look at Due Process for Prisoners* (1975) 26 Hastings L.J. 1277, 1289-1290; Note, *Procedural Due Process in Prison Disciplinary Proceedings—The Supreme Court Responds* (1975) 53 N.C.L.Rev. 793, 803; Com., *Wolff v. McDonnell: The Handwriting on the Prison Wall* (1974) 10 New Eng.L.Rev. 509, 527; Gobert & Cohen, Rights of Prisoners (1981) § 8.05, pp. 236, 238; A.B.A. Standards for Criminal Justice, Legal Status of Prisoners (1981) std. 23-3.2(b)(ii) and commentary at pp. 23.40-23.41; but see Meyers & Rabiej, *Burden of Proof and the Standard of Judicial Review in Prison Disciplinary Hearings Involving Decisions Predicated Upon Uncorroborated Hearsay Evidence* (1979) 4 So.Ill.U.L.J. 535, 560-561 [in view of the dangers that would underlie in camera examination of informants, "[a] more promising alternative would be to require an in camera examination of the charging officer, the confidant of the inmate informant."].)

Finally, although the United States Supreme Court has not spoken explicitly on the in camera issue, its recent disciplinary due process decisions in no way suggest that, as Jackson claims, inmate due process protections have expanded since *Wolff, supra,* 413 U.S. 539. If anything, the court's most

---

[7]Jackson cites nothing to indicate that any Wisconsin court has so held, or that any Wisconsin disciplinary board has in fact conducted such an in camera hearing.

It is true that one court (*McGinnis* v. *Stevens* (Alaska 1975) 543 P.2d 1221) mentioned in dictum there is "considerable merit" in the view that in camera review of a confidential informant's reliability is constitutionally compelled (*id.,* at p. 1231, fn. 28, citing Justice Marshall's *Wolff* dis. *supra,* 418 U.S. 539, 580 [41 L.Ed.2d 935, 965]), but we have found no Alaska case so holding.

recent inmate-due-process cases suggest constriction of such protection. In *Baxter* v. *Palmigiano, supra,* 425 U.S. 308, the court held that contrary to several lower courts' interpretation of *Wolff,* a disciplinary board is *not* required to state on the record reasons for denying an inmate the right to confront opposing witnesses. In *Hewitt* v. *Helms* (1983) 459 U.S. 460 [74 L.Ed.2d 675, 103 S.Ct. 864], the court agreed that an inmate had a protected state-created liberty interest in continuing to reside in the general prison population rather than administrative segregation, but reversed that part of the Third Circuit's holding concluding that minimum procedural due process was not afforded the inmate: prison officials, said the court, did not have to provide a *Wolff*-type hearing, but "were obligated to engage only in an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wished to submit, within a reasonable time after confining him to administrative segregation." (*Id.,* at p. 472 [74 L.Ed.2d at p. 689].) Shortly thereafter the court held in *Olim* v. *Wakinekona* (1983) 461 U.S. 238 [75 L.Ed.2d 813, 103 S.Ct. 1741] that state prison regulations placing no substantive limitations on prison officials' discretion to transfer an inmate interstate create no liberty interest protected by the federal due process clause. In another case the high court has held that although a disciplinary board must give *reasons* for denying an inmate his right to call favorable witnesses, such reasons need not be made part of the administrative record, but may be elicited from the board at a later (in camera) court hearing if and when the inmate challenges his disciplinary finding. (*Ponte* v. *Real* (1985) 471 U.S. 491 [85 L.Ed.2d 553, 105 S.Ct. 2192].) Most recently the court held in *Superintendent, Mass. Corr. Institution* v. *Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768] that disciplinary findings need not be supported by substantial evidence, but merely "some" or "any" evidence.

As appears, nothing in the federal circuit cases, the state cases, or the high court's recent decisions suggests the United States Supreme Court either has embraced, or will soon adopt, the "expansion" of federal due process protection advocated by Jackson.

## II. STATE DUE PROCESS

■ In *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622], we explained that, unlike the approach used in the federal cases, our "due process analysis must start not with a judicial attempt to decide whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." (*Id.,* at p. 264; see also *id.,* at pp. 266-268.)[8] Once it is deter-

---

[8] It is uncontested that under either approach, inmates' due process rights are implicated here.

mined that due process rights are triggered, however, a flexible balancing standard similar to that employed in the federal cases is used to determine what process is due. ■ Therefore, we held in *Ramirez* that "identification of the dictates of due process [Cal. Const., art. I, § 7, subd. (a); *id.,* § 15] generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Id.,* at p. 269.)

■ Jackson claims that under this test a disciplinary board must conduct an in camera interview of any confidential informant before such information may be used as the *sole* basis on which the prison administration decides to discipline an inmate. Given the present state of the evidence, we do not agree.

First, it is true that inmates' private interests may be significantly affected by a disciplinary board's findings. An inmate found guilty of a serious rules violation (Cal. Admin. Code, tit. 15, § 3315) may suffer a loss of accrued good time or worktime credits and the loss of the opportunity to earn such credits for a limited period of time. (Pen. Code, § 2932; Cal. Admin. Code, tit. 15, §§ 3315 & 3323.) Such a finding may also alter an inmate's conditions of confinement to his detriment by subjecting him to placement in a segregated housing unit. (Cal. Admin. Code, tit. 15, §§ 3315, 3317 & 3330.)

Second, it is also true there is a risk of erroneous deprivation of an inmate's interests to the extent a hearing officer might rely exclusively on confidential information.[9] The regulations currently in place, however, speak directly to that risk: California Administrative Code, title 15, section 3321, subdivision (c) provides that no disciplinary finding can be based on confidential informant information unless other written information corroborates the infor-

---

[9] Jackson's expert declarant (a former superintendent of Deuel Vocational Institution at Tracy), for example, stated that only 10 percent of such information is reliable because "in many cases it is not based on personal knowledge, but on rumor. Many times the inmates' perception of events is distorted and is based on unfounded assumptions. In addition, because real names are seldom used in prison and identification between inmates occurs through gang nicknames and sight, verbal or written communication or identities very often is not accurate." Furthermore, inmates often become informants "in order to curry favor or good will from an officer, or in exchange for material gain. In many cases inmates provide information because they want to increase their self-esteem."

mant *"or unless* the circumstances surrounding the event and the known reliability of the source *satisfy the finder of fact that the information is true."*[10]

We conclude that if the underscored mandate is adhered to by the disciplinary factfinder,[11] and furthermore, if the disciplinary record contains information (confidential or otherwise) from which a reviewing court can conclude the hearing officer made a reliability determination and that evidence supports that determination, an inmate charged with a rules violation solely on the basis of confidential informant information faces only a minimal risk of erroneous deprivation of his private interests. At the same time, it must also be acknowledged that the proposed procedure may have "probable value," i.e., it seems reasonable to assume that accuracy of disciplinary determinations would be enhanced by a hearing officer's personal examination of the "prosecuting witness." As disclosed *post,* however, a procedure's mere "probable value" will not compel its adoption; the procedure must be shown to be feasible under the circumstances.

Third, Jackson does not forcefully dispute that the present regulations adequately accommodate inmates' dignitary interests as described in *Ramirez, supra,* 25 Cal.3d 260. To the extent possible without disclosing informant identity, the regulations direct that an inmate be given advance written notice of the charge against him, a hearing before an impartial hearing officer, a written statement by the factfinder as to the evidence relied on and the reasons for any disciplinary action taken, and a limited right of confrontation and cross-examination at his disciplinary hearing. (Pen. Code, § 2932, subds. (c), (d) & (e); Cal. Admin. Code, tit. 15, § 3320.)

Fourth and most significantly, there is a serious question whether the proposed in camera requirement could be implemented feasibly, i.e., without unduly burdening the governmental interest in maintaining discipline, order and security in the institution and providing for the safety of all inmates in custody. It is true, as Jackson observes, that two states—Wisconsin and Ohio —appear to have regulations that *permit* (but do not *require*) such in camera

---

[10] The preceding subdivisions of the same section provide: "(a) The identity of the source of information upon which a disciplinary action is based may be kept confidential if disclosure would endanger the safety of the source or endanger institutional security. Precautions must be taken to insure the reliability of such information. [¶] (b) The fact of a confidential source will be documented in the information given to the inmate, and as much of the information received as can be disclosed without identifying the source will also be given the inmate. Any document relating information from a confidential source will also include an evaluation of the reliability of the source, a brief statement of the reasons for the conclusions reached, and a statement of the reasons why the information or source is not disclosed."

[11] We note that, in certain situations, it may be necessary for the hearing officer to interview, in camera, the *reporting guard or officer* in order to satisfy himself of the *informant's* reliability and the truthfulness of the information. (*Post,* at pp. 515-516.)

interviews of confidential informants. (See *State* v. *Dept. of Health & Social Ser., supra,* 340 N.W.2d 194, 196; Jacobs & Sharma, *supra,* 12 Stetson L.Rev. 98, 106.) He provides us, however, with no information suggesting that any Wisconsin or Ohio disciplinary board has elected to so proceed, nor do we have any evidence that such a procedure has been feasibly implemented or that it continues today.

The record on this point in the present case—consisting merely of opposing declarations—is conflicting, and insufficiently developed to determine the issue one way or the other. Jackson's experts hypothesized that procedures could be implemented to protect the confidentiality of inmate informants who would be made to testify in camera before a hearing officer.[12] On the other hand, the prison administration's expert argued that (i) no such procedures could successfully maintain confidentiality in the close prison environment; (ii) accordingly, few informants would volunteer information (and in any event informants would not likely volunteer information if they knew they would be called before a hearing board); and (iii) finally, even if called before a board, it is questionable whether an inmate would disclose information to anyone other than the reporting guard with whom he initially placed his trust.[13] As a result, say the prison's administrators, the govern-

---

[12] For example, one of Jackson's experts declared: "There are many ways in which the hearing officer can interview the informant without creating an unreasonable risk of disclosure of the informant's identity. In my opinion the logistics of the interview is not a very serious problem. There are countless reasons such as classification hearings, disciplinary hearings, job interviews, etc., why the hearing officer, who is normally in a position of authority within the housing unit, would have occasion to talk to an inmate. A meeting could easily be arranged which would not create undue suspicion."

[13] The prison's declarant (the chief disciplinary officer at San Quentin) stated: "At San Quentin, disciplinary hearings are typically held in the housing unit in which the charged inmate is then located. The hearings are held in one of the program administrator's or counselor's offices within the housing unit. [¶] Any inmate witness (typically for the defense) or informant would be brought to the hearing room in the housing unit in which the charged inmate is then located. In many cases in which weapons have been involved in an incident leading to a disciplinary charge, the charged inmate is placed in a segregated housing unit. In those cases, any inmate witness or informant in the general population or mainline areas would have to be transported to the segregated housing unit and escorted into it. This is an unusual situation and would immediately attract the attention and pique the curiosity of the inmates in the segregated housing unit, thereby increasing the risk that the identity of any inmate informant would be revealed. [¶] In cases in which the charged inmate has been allowed to remain in his assigned housing unit, it would be very difficult for a disciplinary hearing officer to examine inmate informants during the course of a disciplinary hearing without revealing their identities to the other inmates in that unit. [¶] It is commonly the case that the identity of inmate informants is not even disclosed to the disciplinary hearing officer. It is also very likely that if the identity of an informant is disclosed to a disciplinary hearing officer, the informant would refuse to speak when questioned by the hearing officer. This is because many inmate informants provide information only to one or a few employees who have cultivated the inmates' trust and to whom the inmates feel they can divulge information without risking revealing their identities. If the disciplinary hearing officer is not one of the employees whom an inmate informant confides in and trusts, it is not likely that he would di-

ment's interest in maintaining a secure prison, and retaining a system by which it relies on confidential informants to identify prison rule violators, would be seriously burdened by the proposed procedure. (*Ante,* fn. 13.)[14]

Perhaps as an implicit recognition that the present record inadequately demonstrates the feasibility of his proposal, Jackson has requested we take judicial notice of two matters, and we have granted his motion. The first is a recent "order" issued by a court-appointed special master in *Toussaint* v. *McCarthy* (N.D.Cal. 1984) 597 F.Supp. 1388, reversed in part (9th Cir. 1986) 801 F.2d 1080; the other consists of partial transcripts of testimony in hearings conducted by that same special master. Having reviewed the noticed documents, however, we must conclude they do not establish the feasibility of the proposed in camera scheme.

*Toussaint* is a federal case involving, inter alia, due process safeguards for decisions to place or retain San Quentin and Folsom prison inmates in segregated housing units. The special master's order requires San Quentin to release from such custody a recognized informant, known as "Pin Cushion" because he has been stabbed 122 times by other inmates. Jackson calls to our attention the special master's remarks about the use of confidential information by prison officials. In a recent decision the special master stated, "in most instances prison officials rely upon shadowy information gleaned from so-called 'confidential' inmate sources, who deliver their damaging allegations free from cross-examination in a context prone to manipulative deception."

---

vulge any information of a confidential nature to the hearing officer. [¶] The possibility does exist that the location of a disciplinary hearing could be changed if the disciplinary hearing officer was required to independently interview any inmate informant. However, inmates are generally aware that disciplinary hearings are typically held within the housing units, and any change in the location of a disciplinary hearing would attract their attention, thereby increasing the risk that the identity of any inmate informant brought to the hearing would be revealed. [¶] It is also possible that a secret rendezvous with the disciplinary hearing officer and any inmate informant could be arranged. However, the secrecy of any such rendezvous within the confines of the prison could not be guaranteed. Moreover, for the reasons discussed above, it is not likely that an inmate informant would divulge any confidential information to a disciplinary hearing officer if the officer is not one of the employees whom the inmate has previously confided in or trusts. [¶] In sum, it would be very difficult to arrange for inmate informants to be examined by a disciplinary hearing officer without risking revealing their identities to other inmates. Revealing the identities of inmate informants would seriously jeopardize their safety and the security of this institution. Further, if inmates who have previously provided information, or those who might do so in the future, fear that their identities will be revealed if they must be examined by a disciplinary hearing officer, the effective use of inmate informants in the institution will be seriously hampered."

[14] The People also assert the proposed in camera procedure would impose possibly substantial "fiscal and administrative burdens" on the government. They claim that not only would the process necessarily be lengthened, it would also require prison officials to take "extreme measures" to protect inmates' confidentiality.

It is beyond dispute, however, that use of confidential informants carries with it the potential for manipulation. The special master's comments in *Toussaint* merely point up the need for prison hearing officials not to "delegate" their duty to determine inmate veracity to the reporting guards, but to abide by the administrative regulation, which requires the hearing officer *personally* to find the informant is both reliable and truthful before using such information as the *sole* basis for imposing disciplinary sanctions. (Cal. Admin. Code, tit. 15, § 3321, subd. (c).)

Jackson next points out that, in selected statements made by a San Quentin associate warden in the course of the above proceedings, the witness stated that prison inmate informants are given polygraph examinations "fairly frequently" and that this shows the proposed in camera procedure would indeed be feasible. In other words, he suggests that if prison officials can conduct polygraph examinations of informants while (apparently) protecting their anonymity, they can do the same with in camera hearings. The People, however, question this conclusion on various grounds. First, they point out that the proceedings conducted in the federal case were focused on the narrow issue of the need to segregate a particular inmate, and did not purport to reach broader questions involving the disciplinary hearings and the feasibility of the proposed mandatory in camera procedure. Second, there was no testimony about the timing, location, or security provisions of those polygraph examinations referred to by the associate warden. The timing question in particular is important, the People stress, because disciplinary proceedings are subject to stringent administrative and statutory time constraints. (Pen. Code, § 2932, subd. (c)(1); Cal. Admin. Code, tit. 15, § 3320.) Finally, the People suggest the associate warden was neither prepared nor authorized to discuss the prison's polygraph examination policies, and that in any event such statements should not be understood as a general admission as to the feasibility of the proposed in camera procedure.

We must conclude that, on this crucial fourth factor, the present record, supplemented by the noticed documents, fails to establish the feasibility of the proposed in camera procedure.

Balancing all four of the above factors, we conclude the proposed in camera procedure is not required by the due process clauses of the California Constitution, and that the existing regulations provide inmates with due process.[15] Although it may be necessary in particular cases for a hearing officer to interview—in camera, of course—the *reporting guard* in order to

---

[15] We emphasize that, like the United States Supreme Court's earlier review of prison disciplinary procedures under the federal due process clause (*Wolff* v. *McDonnell, supra,* 418 U.S. 539, 572 [41 L.Ed.2d 935, 960]), our conclusion that *Ramirez* does not compel the procedure advocated here is "not graven in stone." The balance might well tip in favor of requiring such a procedure if it can be shown that the proposed scheme is feasible (i.e., if a proponent can produce evidence that would negate the prison administration's above-cited concerns (*ante,* at p. 513). Such a showing might be made on the basis of expert witnesses' *testimony* (subject, of course, to cross-examination). (See *McCollum* v. *Miller, supra,* 695 F.2d 1044, 1049.) Evidence regarding actual experience with procedures identical to, or at least substantially similar to, those proposed would also be of considerable value in this respect.

satisfy himself that the *informant* is both reliable and truthful (Cal. Admin. Code, tit. 15, § 3321, subd. (c); see also *Wilson* v. *Farrier, supra,* 372 N.W.2d 499, 502; *Niday* v. *State, supra,* 353 N.W.2d 92, 93-94; *Homer* v. *Morris, supra,* 684 P.2d 64, 68; *Hudson* v. *Cady* (E.D.Wis. 1985) 610 F.Supp. 1096, 1098; Meyers & Rabiej, *supra,* 4 So.Ill.U.L.J. 535, 560-561), nothing in the present regulation prevents the hearing officer from so doing. We stress, however, that in a case in which such information is the sole basis for imposing disciplinary sanctions, the regulation requires the hearing officer personally *to* make a reliability and truthfulness finding, and therefore—as almost every other court recently addressing the issue has held—the disciplinary record must contain information (confidential or otherwise) from which a reviewing court can conclude the hearing officer actually made a reliability and truthfulness determination, and that the determination is supported by evidence. (See *Kyle, supra,* 677 F.2d 1386, 1390-1391; see also *Nelson* v. *Commission, supra,* 456 N.E.2d 1000, 1009-1010; *Shumway* v. *Oregon, supra,* 657 P.2d 686, 687-688; *Niday* v. *State, supra,* 252 N.W.2d 92, 93-94; *Homer* v. *Morris, supra,* 684 P.2d 64, 68; *Dawson* v. *Smith, supra,* 719 F.2d 896, 899; *Finney* v. *Mabry, supra,* 455 F.Supp. 756, 769; cf. *Ponte* v. *Real, supra,* 471 U.S. 491, 504-516 [85 L.Ed.2d 553, 564-571, 105 S.Ct. 2192, 2200-2205] (Marshall, J., dis.).)

The judgment of the superior court is reversed.

Petitioner's application for a rehearing was denied March 4, 1987.