[No. A052250. First Dist., Div. Three. May 21, 1992.]

In re WALTER E., a Person Coming Under the Juvenile Court Law.
DEPARTMENT OF SOCIAL SERVICES OF THE CITY AND COUNTY
OF SAN FRANCISCO, Plaintiff and Respondent, v.
ERNESTINE A., Defendant and Appellant.

**COUNSEL**

Joan Isserlis, under appointment by the Court of Appeal, for Defendant and Appellant.

Louise H. Renne, City Attorney, Loretta M. Giorgi and Charlotte Siggins, Deputy City Attorneys, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—This appeal is from a dispositional judgment by the juvenile court renewing the dependency status of minor Walter E. (Walter) and committing him to the San Francisco Department of Social Services (the Department) for placement, planning, and supervision. Appellant Ernestine A. (Ernestine), the minor's mother, contends that the juvenile court committed prejudicial error in permitting a psychologist the Department selected to examine the minor and testify as an expert regarding his best interests; that the court denied her due process in refusing to appoint a second psychologist of her own choosing to examine the minor; and that the evidence does not support the court's findings. We disagree and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Walter was born on November 2, 1976. In August 1989, the Department received an anonymous report that Ernestine was addicted to crack cocaine; that she was using food stamps and money from Aid to Families With Dependent Children (AFDC) to purchase drugs; that her four children, aged four through thirteen, were not being fed or clothed properly and begged from door to door for food; and that their house was filthy, unsafe, and unsanitary. The Department's investigation verified this report.

On August 17, 1989, the Department filed a petition to have Walter declared a dependent child of the juvenile court, alleging that he came within the provisions of Welfare and Institutions Code section 300, subdivisions (b)

and (j),[1] on the grounds of substantial risk that he would suffer serious physical harm or illness as a result of his parents' inability to provide regular care for him.[2] Following detention hearings, 13-year-old Walter was placed in the home of Alandria A. (Alandria), Ernestine's sister, for his protection.

On October 16, 1989, the juvenile court ordered a psychological evaluation of Walter. His parents refused to authorize any such evaluation or therapy. On November 8, 1989, following a jurisdictional hearing, the juvenile court sustained the Department's petition and declared Walter a dependent of the court under section 300, subdivisions (b) and (j). After a dispositional hearing on November 9, 1989, the juvenile court ordered Walter's continued placement in the home of his maternal aunt, Alandria. The court also set a series of reunification requirements for the parents as the conditions for the return of Walter to their home.

The Department's child welfare worker on the case, Donna Briggs, filed a progress report in January 1990. Briggs reported that reunification was premature. The parents provided no documentation of their family therapy and drug treatment, and they failed to make a scheduled visitation. The juvenile court ordered travel expenses to the parents for their visits and terminated visitation pending further hearing if the parents failed to make a scheduled visitation without prior notification of their inability to attend.

In March 1990, the parents moved pursuant to section 388 for modification of the juvenile court's prior order placing Walter and the other children with Alandria, and for the resumption of parental custody. The motion alleged that the parents had "substantially complied with their reunification requirements"; that the children had "expressed a desire to return home"; and that they had suffered beatings and "abuse in the home of their placement caretaker that is more harmful than the neglect originally alleged about the parents' home." After a settlement conference, all parties agreed that the Department investigate and assess the conditions at the caretaker's home, including the allegations of beatings and abuse.

On April 16, the Department applied ex parte for a temporary stay of visitation and a "stay away" order to prevent the parents from harassing Walter and the other children at Alandria's home. The application included Briggs's declaration citing several "alarming incidents" during previous visitations, including a drug transaction in Walter's presence by Harold and

---

[1]Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2]References to Walter's "parents" are to Ernestine, his natural mother, and Harold A. (Harold), Ernestine's current spouse and the father of her two youngest children. Both Ernestine and Harold filed a notice of appeal, but only Ernestine has filed a brief on appeal.

extremely hostile and volatile behavior by the parents towards Briggs herself. The juvenile court issued the requested temporary orders and set the matter for further hearing.

On May 15, 1990, the Department reported to the juvenile court that Walter had told Briggs that he and his siblings "were being coerced by the parents to tell the authorities that they wanted to go home"; that when they were living with their parents, "they were regularly whipped with a dog leash" on an almost daily basis; that Walter and his siblings were happy in their current placement; and that Alandria appeared to be providing good care and an "excellent placement" for the children.

On May 16, 1990, the juvenile court denied the section 388 motion, renewed Walter's dependency status and placement with Alandria, dismissed the temporary restraining order, and established a new weekend visitation schedule with certain conditions on the parents. Three weeks later, the Department again sought to modify the visitation plan, on the grounds of continuing "very abusive," "threatening," "deeply disturbing," and "assaultive" altercations between the parents on one side, and both Alandria and the Department's child welfare worker on the other. The juvenile court modified visitation to one overnight visit per week with the Department providing transportation both ways.

On July 3, 1990, the Department filed a petition under section 387, seeking a new placement for Walter because his aunt was "no longer able or willing to provide a home" for him due to his "beyond control behavior," and his parents had not yet completed the reunification requirements and were not capable of providing a home for him. The Department submitted a declaration by child welfare worker Marjorie McGill Barr stating that Walter avoided the home where he was supposed to visit his parents and instead stayed out late; that the aunt reported that the parents undermined her authority and encouraged Walter to disrespect her; and that Walter twice stated his desire to leave.

On July 5, 1990, the Department filed another petition pursuant to sections 342 and 387, requesting supervision of all visits because the parents "may have emotional problems as evidenced by their erratic and irrational behavior which has resulted in minor, Walter's acting-out and has jeopardized his placement."

The Department submitted the declaration of child welfare worker Briggs, detailing a lengthy history of highly irrational and explosive behavior by the parents. Among other things, this included a continuous barrage of hostile

threats and obscenities directed at Briggs and Alandria; a tendency to acts of violence; attempts to coerce Walter and his siblings into telling the juvenile court that they wanted to return home to their parents; evidence of frequent physical abuse of Walter and his siblings; illegal drug-related activities conducted in the presence of the children; evidence of a pattern of pathological lies and deceit; complete denial of the existence of any problems and total lack of remorse for harm inflicted on others; and a complete failure to follow through on the court-ordered reunification requirements. Briggs recommended that any further visitation be limited and supervised, and that both parents be psychiatrically evaluated.

The Department also submitted the declaration of child welfare worker Barr. Barr made observations similar to Briggs's and reached the same recommendation. Barr also gave examples of the parents' efforts to undermine Walter's placement with Alandria through threats, intimidation, and a campaign to discredit her in the eyes of the children.

On July 5, 1990, the juvenile court ordered Walter to an interim shelter care facility because "[t]here is substantial danger to the physical health of the minor or the minor is suffering severe emotional damage and there are no reasonable means to protect the minor's physical or emotional health without removing the minor from the parent's or guardian's physical custody." On July 12, 1990, the juvenile court terminated visits by Walter with his parents and ordered limited and supervised visits by the other children.

On July 12, 1990, at the request of the Department and pursuant to the court's prior order, Dr. Douglas Korpi, a clinical psychologist, examined Walter. In a written report Dr. Korpi said Walter had "some very serious deficits in terms of his ability to cope on a day to day basis," and recommended that "the more structure, input and attention this boy receives the better off, more organized, more predictable and less violent he will be. If we place him into any sort of chaotic environment we can anticipate that he will himself behave in a chaotic fashion."

On July 17, 1990, the Department recommended that Walter's placement be changed from Alandria's home to the "care, custody, [and] supervision" of the Department.

On August 2, 1990, the Department requested that a psychotherapist examine both of the parents. Both Barr and Briggs witnessed continuing erratic, irrational, and sometimes violent behavior toward the Department's social workers and Alandria. Following a hearing, the parties stipulated that the parents would enter therapy as an additional condition of reunification.

On August 13, 1990, the parents requested the appointment of psychologist Nathan Hare, Ph.D., to examine Walter. The parents argued that "[they] need to have an expert appointed on their behalf to counter Dr. Korpi's anticipated testimony that the children are emotionally damaged as a result of parental neglect." The Department opposed the appointment because the children should not be subjected to another evaluation simply because the parents disagree with the court-appointed psychologist, and "How can counsel be so certain the results of the evaluation [by the parents' chosen psychologist] will in fact counter the prior evaluation [by Dr. Korpi]?"

On September 21, 1990, the juvenile court denied the parents' motion but ordered funds to enable them to retain their own expert for consultation. The juvenile court found that examination by another psychologist was not required because "there is no showing of prejudice on behalf of the expert [Dr. Korpi], [and] that, in fact, he is a qualified, unbiased examiner."

On the parents' request, the court set the motion for rehearing on November 2, 1990.

At the jurisdictional hearing on October 17-19, 1990, the Department presented the testimony of several of the social workers who were assigned to Walter's case. Child welfare workers Karen Rosen and Donna Briggs testified that Alandria could not control Walter's behavior or his tendency to act out his frustrations; that Alandria did not assist in getting Walter into a therapy program; and that the parents were violently and irrationally hostile toward both Alandria and the Department case workers. Rosen testified that it would not be in Walter's best interests to return to Alandria's house and that he would benefit more from the greater structure of a residential treatment program.

Martha Myhand and Judith Buschiazzo, two supervisory employees of a boys' group home where Walter had been placed, testified that Walter would easily become enraged and verbally abusive, even when asked to perform "fairly routine" tasks in the program. After approximately two months, he was asked to leave because his behavior was "out of control." At that point, Walter wanted to return to live with Alandria.

Alandria testified that, pursuant to court order, Walter had lived with her from approximately August 1989 to June 1990. He had stopped living with her when his behavior became too difficult to control, and he refused to abide by the rules of her house. On the other hand, Alandria also testified that she wanted to take Walter back, despite the impending birth of her first child. She felt that would be better than "switching him from group home to

group home," and she was "willing to take the chance" that she would continue to have problems with him.

Dr. Korpi, the psychologist who had examined and evaluated Walter at the Department's request, testified that Walter suffered from a conduct disorder arising from an underlying identity disorder. As a result of Walter's "unstable, undefined" identity and his sense of vulnerability, he was prone to "act out" or become aggressive and antisocial under circumstances of stress or pressure. Dr. Korpi testified that a residential treatment program with a serious therapeutic element and continued family involvement would represent the best option for Walter; but that if he were sent back to live with Alandria, he would not improve.

The juvenile court found that although Alandria was "a caring, capable person who has contributed to, not only the welfare of Walter, but also his siblings," it would not be in Walter's best interests for him to return to her care at that time. Instead, the juvenile court ordered that he be placed in a residential treatment facility "as soon as possible." The juvenile court also stated that if Walter was not quickly placed in a satisfactory residential home, it would "seriously consider a motion to dismiss the petition . . . ."

As previously ordered, on November 2, the court reheard the parents' motion for appointment of a psychologist of their choice to evaluate Walter. The parents sought to demonstrate that Dr. Korpi was biased in favor of the Department. Child welfare worker Barr was questioned about her contacts with Dr. Korpi and the Department's procedure in appointing him to evaluate Walter. Barr testified that neither the parents nor their attorney had given her any information for Dr. Korpi to consider in evaluating Walter. The parents argued that they were entitled to the appointment of their own psychologist because the Department had not taken their opinions into account in selecting Dr. Korpi. The juvenile court denied the parents' motion on the grounds that section 370 authorized the Department to select the psychologist.

At the dispositional hearing on December 18, 1990, Department child welfare worker Karen Rosen testified that Walter had been in a residential treatment program in Sonoma for eight weeks, appeared to be "fitting in very well into the program," despite "ups and downs," and was "making progress" in demonstrating a growing ability to control his anger. Unlike in the past, Walter no longer requested return to his parents or Alandria, and instead expressed a desire to stay in the residential program. Alandria also supported this option. Although Ernestine had the telephone number for the residential program and knew that funds could be made available for her to

visit Walter, she neither called nor attempted to visit. In fact, Walter did not want to visit with his parents; and he no longer wished to return home, in part because of a violent confrontation he had in October 1990 with Harold.[3]

Dr. Nathan Hare, who had never seen Walter, tested him, or discussed him with Dr. Korpi, testified on the parents' behalf. Based on his review of materials Dr. Korpi and the various social workers had prepared, Dr. Hare testified that Dr. Korpi's approach was "culturally biased" toward "white, middle-class persons"; that Dr. Korpi had intentionally sought to use the results and scores on tests he administered to Walter to validate and confirm the opinions the Department social workers and investigators had expressed; that Dr. Korpi erred by not speaking with the parents; that Walter's behavior was not unusual for a Black child raised in a housing project environment; and that the Department was trying to alienate Walter from his parents, his culture, and his background.[4] He recommended that the court return Walter to his parents; that he and his family be provided with therapeutic services; and that the Department provide resources and services to assist the family in other ways.[5]

The juvenile court found clear and convincing evidence "that an award to a parent would be detrimental and an award to a nonparent is required in order to serve the best interest of the minor. The welfare of the minor requires that custody remain taken from his parents." The juvenile court continued Walter's dependent status and committed him to the care and custody of the Department for placement, planning, and supervision.[6] This appeal followed.

---

[3]On October 20, 1990, in the presence of a Department social worker who was supervising a visit between Walter, his siblings, and Harold, Harold had shouted at Walter, "You are the reason for all of the problems the family is having." When Walter told him to "fuck off," Harold "grabbed him by the shoulders, and shook him strongly, and pushed him against the hood of the car." When the social worker intervened, Walter ran off and telephoned Alandria. According to Harold, he and Walter only had "a little problem, which all fathers and sons do have." After this incident, visitation was discontinued at Walter's own request.

[4]In contrast to his criticism of Dr. Korpi for not talking with Walter's parents, Dr. Hare stated that he did not need to see Walter or make his own mental status evaluation of the minor prior to testifying at the hearing.

[5]Dr. Hare stated: "I would recommend . . . that they be given . . . all the resources that the Department of Social Services can provide to help the family to make it after they get back together. Perhaps somebody to help the mother in the evening to care for the children, to feed them, give them meals and so on, help like that would be very nice. [¶] They should help them with the resources that they need since they are being punished by being poor."

[6]In its disposition, the juvenile court clearly indicated its continuing hope that reunification with the parents could still take place. The juvenile court stated: "This case is not that old. It's August of 1989. It's been filed just about a year and a half and the parents hopefully, fortunately, thankfully—and I say parents because you [Harold] have been around the minor

## DELEGATION OF POWER TO SELECT CLINICAL EXPERT

■ Ernestine argues that the juvenile court erroneously gave the Department "unfettered discretion to choose a psychologist to examine Walter." We disagree.

Section 370 provides: "The juvenile court may, in any case before it in which a petition has been filed as provided in Article 7 (commencing with Section 305), order that the probation officer obtain the services of such psychiatrists, psychologists, or other clinical experts as may be required to assist in determining the appropriate treatment of the minor and as may be required in the conduct or implementation of such treatment. Payment for such services shall be a charge against the county."

Under section 272, subdivision (a), county boards of supervisors may delegate to their respective welfare departments "all or part of the duties of the probation officer concerning dependent children . . . ." California Rules of Court, rule 1401(a)(12), in turn provides that "[p]robation officer," as used in section 300 proceedings, includes any social worker in the county agency designated by the board of supervisors as responsible for the administration of child welfare. In the City and County of San Francisco, the duties of the probation officer in child welfare matters are delegated to the Department. (S.F. Admin. Code, §§ 20.1, 20.8.)

Ernestine correctly contends that section 370 gives the juvenile court "the ultimate authority" to decide if a minor should be evaluated. However, there is nothing in either the statute or the case law interpreting it to support Ernestine's further conclusion that this provision reserves exclusively to the juvenile court the ultimate decision on which specific expert or experts should be selected to conduct evaluations of the minor. On its face, the statute authorizes the juvenile court to "order that the probation officer

since 10 years of age, that does give you a familial status—seem to be addressing the problem and hopefully reunification can come about.

"At this time the minor's best interest . . . is served by staying where he is, and I hope that you may file your [section] 388 petition [to change, modify or set aside a previous court order, or to terminate the jurisdiction of the juvenile court] just as soon as the parents have not only fulfilled the requirements for reunification, because that is just the minimal requirements, but so that they are in a position so that the best interest of the minor is to return him to a stable home wherein his issues can be addressed with the parents individually as well as collectively.

"So it appears that an award to a parent would be detrimental and an award to a nonparent is required in order to serve the best interest of the minor. The welfare of the minor requires that custody remain taken from his parents. Reasonable efforts have been made to prevent or eliminate the need for removal of the minor from his home and make it possible for him to return to his home. The minor is committed to the Department of Social Services for placement, planning and supervision."

obtain the services of such psychiatrists, psychologists, or other clinical experts as may be required . . . ." Read in conjunction with section 272, subdivision (a), and the applicable portions of the San Francisco Administrative Code, we conclude that this provision gives the juvenile court authority first to determine the need for expert services, and then to delegate to the Department the selection of the experts.

The case law supports this interpretation. ■ In *In re Danielle W.* (1989) 207 Cal.App.3d 1227 [255 Cal.Rptr. 344] the court said, "The Department, which is acting as the probation officer, acts as an arm of the court in the best interests of the minor. [Citation.] Pursuant to statutory authority it acts 'as a representative of the state which stands *in loco parentis* to the minor in a proceeding whose primary consideration is the minor's welfare. [Citation.]' [Citation.]" (*Id.*, at pp. 1234-1235.)

Although the statute does not expressly provide that the probation officer (or equivalent) may select the clinical experts to conduct the psychological evaluation, the juvenile court's power to delegate this authority to the Department may be inferred under applicable principles governing delegation of authority and the separation of powers. ■ " '. . . [E]ven the primary function of any of the three departments [legislative, executive, and judicial] may be exercised by any other governmental department or agency so long as (1) the exercise thereof is incidental or subsidiary to a function or power otherwise properly exercised by such department or agency, and (2) the department to which the function so exercised is primary retains some sort of ultimate control over its exercise, as by court review in the case of the exercise of a power judicial in nature.' [Citation.]" (*In re Danielle W., supra,* 207 Cal.App.3d at p. 1236; see also *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756-759 [270 Cal.Rptr. 326].)

■ Here, the selection of the identity of the clinical experts "as may be required to assist in determining the appropriate treatment of the minor and as may be required in the conduct or implementation of such treatment" (§ 370) is not primarily a judicial function; it does not involve the declaration of law or the determination of the rights of the parties to a controversy before the court. (*Marin Water etc. Co.* v. *Railroad Com.* (1916) 171 Cal. 706, 711-712 [154 P. 864].) The exercise of this function is instead clearly incidental or subsidiary to a function or power otherwise properly vested in the Department; namely, the administration of laws and procedures dealing with dependent children in general, and the provision of appropriate therapeutic treatment for such dependent children in particular. Finally, the juvenile court retains ultimate control over the exercise of this function, through its review of the expert's ultimate report in the context of the jurisdictional and dispositional proceedings in which it is introduced.

To urge, as does Ernestine here, that the juvenile court must itself approve or disapprove of the specific selection of experts would transfer the exercise of what is an essentially ministerial function from the administrative agency with the most expertise in the area to a judicial officer. As a matter of sound public policy, it makes more sense for the Department to select the evaluating psychologist. The Department, which is charged with the actual care, custody, and supervision of dependent children and the administration of therapeutic services provided to them, is clearly the entity best able to perform the task of selecting the particular psychologist to perform a clinical examination of the minor. (*In re Jennifer G., supra,* 221 Cal.App.3d at pp. 757-758.)

Moreover, Ernestine's position that the juvenile court, rather than the Department, must select the expert rests on the false assumption that the relationship between the parents and the Department is adversarial. The Department functions not as the parents' adversary, but as an arm of the court and a representative of the state with the primary aim and consideration of protecting the best interests of the minor. (*In re Jennifer G., supra,* 221 Cal.App.3d at pp. 758-759.) "[B]alanced against any possible hardship to the parent weighs the state's legitimate interest in providing an expedited proceeding to resolve the child's status without further delay. . . . 'Dependency proceedings are civil in nature, designed not to prosecute a parent, but to protect the child. . . .' " (*In re Malinda S.* (1990) 51 Cal.3d 368, 384 [272 Cal.Rptr. 787, 795 P.2d 1244].)

DUE PROCESS

Next, Ernestine urges that the juvenile court denied her due process in refusing to appoint a second psychologist of her own choice to examine Walter. We disagree.

In analyzing a due process claim, we apply a "flexible balancing standard" that considers (1) the private interest that the official action will affect; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the dignity interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible governmental official; and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (*In re Malinda S., supra,* 51 Cal.3d at p. 383; *In re Jackson* (1987) 43 Cal.3d 501, 510-511 [233 Cal.Rptr. 911, 731 P.2d 36].)

Here, we conclude that due process does not require that the juvenile court appoint a second psychologist selected by Ernestine to examine Walter. The central purpose of dependency proceedings is to protect the

welfare and best interests of the child, not to punish the parent. (*In re Malinda S.*, *supra*, 51 Cal.3d at p. 384; *Collins* v. *Superior Court* (1977) 74 Cal.App.3d 47, 52-53 [141 Cal.Rptr. 273].) Although a parent has substantial private interests at stake in a section 300 proceeding, including the loss of custody of the child and significant injury to personal dignity (*In re Malinda S.*, *supra*, at pp. 383-384; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901-902 [97 Cal.Rptr. 158]), " '. . . [t]he interest sought to be protected is that of the welfare of a child. Its need to be raised with love, emotional security and physical safety is *paramount* to any right of a neglectful parent to have the custody and physical proximity of its child.' " (*Collins*, *supra*, 74 Cal.App.3d at p. 52, fn. 7, italics added.)

Ernestine cannot demonstrate that the juvenile court's denial of her request for a second expert to examine Walter actually prejudiced her ability to present her case or posed any significant risk of erroneous deprivation of her custodial rights. Ernestine retained the right to cross-examine Dr. Korpi when he gave his testimony. There is no evidence that Dr. Korpi was biased or that he was anything other than a disinterested and highly qualified expert seeking to evaluate the best interests of the minor.

Moreover, the juvenile court in fact afforded Ernestine the means to employ the services of Dr. Hare, her chosen expert, in evaluating the results of Dr. Korpi's tests. Dr. Hare had all the reports and materials Dr. Korpi prepared, as well as the test results and the raw data for his own analysis. Ernestine introduced Dr. Hare's testimony at the dispositional hearing, and the juvenile court considered it. Dr. Hare made a psychological evaluation of Walter and stated recommendations for the child's placement, despite not having clinically evaluated him in person. Hare testified that he did not need to meet Walter to formulate his opinions.

Balanced against any possible hardship to Ernestine's interests we must weigh the state's legitimate and indeed paramount interest in protecting the best interests of the minor and in providing an expedited proceeding to resolve the child's status without further delay. (*In re Malinda S.*, *supra*, 51 Cal.3d at p. 384; *In re Mary S.* (1986) 186 Cal.App.3d 414, 418-419 [230 Cal.Rptr. 726].) In denying Ernestine's request, the juvenile court was acting both to protect the interests of the minor and to prevent the dependency proceedings from becoming an adversarial battle of experts.[7] A requirement that the juvenile court afford each parent in a dependency proceeding a

---

[7]Both the nature of Dr. Hare's stated opinions and Ernestine's advance knowledge of those opinions clearly indicate that she sought Dr. Hare's services, not to shed greater and more objective light on the minor's best interests, but only to present an overtly adversarial attack on the Department's perceived position. In other words, Ernestine was not seeking an

psychological expert of his or her choice, with permission separately to evaluate the dependent minor and present opinion testimony, would unnecessarily prolong jurisdictional and dispositional hearings and impose a significantly greater hardship on the minor.

In sum, there was no violation of Ernestine's due process rights in this case. (*In re Malinda S., supra*, 51 Cal.3d at pp. 384-385; *In re Jennifer G., supra*, 221 Cal.App.3d at p. 759; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 832-835 [269 Cal.Rptr. 624]; *In re Danielle W., supra*, 207 Cal.App.3d at pp. 1237-1238.)[8]

## SUBSTANTIAL EVIDENCE

Finally, Ernestine urges that substantial evidence does not support the decisions of the juvenile court at the jurisdictional and dispositional hearings, concluding in the final dispositional judgment renewing Walter's dependency status.

■ Under section 361, subdivision (b), the clear and convincing evidence standard applies for any juvenile court decision taking a dependent child from the physical custody of his or her parents or guardian. However, the requirement that a party establish facts by "clear and convincing evidence" applies only in the trial court. On appeal, we apply the usual rule of conflicting evidence, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong. (*Crail* v. *Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 283, pp. 294-295.)

Thus, the applicable scope of review in this case is identical to that in civil cases in general. This court has neither the duty nor the right to resolve conflicts in the evidence, pass on the credibility of the witnesses, or determine where the preponderance of the evidence lies. The trier of fact decides

---

independent expert to supplement the evaluation of the court's own expert, but instead a "hired gun" with a predetermined opinion more to the parents' liking. Significantly, Dr. Hare testified that his opinion would have been no different if he had interviewed Walter in person.

[8]As the California Supreme Court explained in a similar context in *In re Malinda S., supra*, 51 Cal.3d at pages 384-385, quoting with approval from *In re Mary S., supra*, 186 Cal.App.3d at pages 418-419: " 'Dependency proceedings are civil in nature, designed not to prosecute a parent, but to protect the child. A parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since "the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence" unlawfully seized. Nor can the parent seek reversal on the grounds of incompetency of counsel. These decisions recognize the paramount concern is the child's welfare. The same principle applies to the father's claimed violation of his right to confront witnesses.' . . . Requiring the state to call every witness mentioned in the social study, including those witnesses whose testimony is undisputed, would needlessly prolong the jurisdictional hearing." (Fns. and citations omitted.)

each of these matters; our power on appeal begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. We resolve all conflicts in favor of the respondent on appeal and give respondent the benefit of all legitimate and reasonable inferences. Where the facts reasonably support more than one inference, we may not substitute our judgment for that of the trier of fact. Considering only the evidence favorable to respondent, the question is whether that evidence is sufficient as a matter of law. If so, we must affirm the judgment. (*In re Marcos S.* (1977) 73 Cal.App.3d 768, 780-781 [140 Cal.Rptr. 912]; *Adoption of R. R. R.* (1971) 18 Cal.App.3d 973, 983 [96 Cal.Rptr. 308].)

Our review of the evidence in the record of this case convinces us that there was substantial, indeed overwhelming evidence to support the juvenile court's decision to renew Walter's dependency status and keep him in the residential setting where the Department had placed him. The testimony and report of Dr. Korpi, together with the testimony of Walter's aunt and the testimony and reports of the various social workers involved in the case, clearly supported the decision of the juvenile court not to return Walter to Ernestine.

The judgment is affirmed.

White, P. J., and Werdegar, J., concurred.