[Nos. D036199, D036952. Fourth Dist., Div. One. Dec. 24, 2001.]

JOHN RYAN, Plaintiff and Respondent, v.
CALIFORNIA INTERSCHOLASTIC FEDERATION-SAN DIEGO
SECTION et al., Defendants and Appellants.

1050

## Counsel

Andrew Patterson; Girard & Vinson, Diane Marshall-Freeman; Neil, Dymott, Perkins, Brown & Frank, Michael I. Neil, Constantine D. Buzunis and Jason E. Gallegos for Defendants and Appellants.

Richard L. Hamilton; Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser and Harrison M. Pollak for Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Defendants and Appellants.

Robert P. Ottilie for Plaintiff and Respondent.

## Opinion

**O'ROURKE, J.**—California Interscholastic Federation (CIF),[1] CIF Executive Director John Hayes, California Interscholastic Federation-San Diego Section and CIF San Diego Section Commissioner Jan Jessop (collectively CIF-SDS) appeal a mandamus judgment directing CIF-SDS to vacate its internal affirmed as modified undue influence ruling arising from the athletic eligibility application of Rancho Buena Vista High School (RBV) for Australian John Ryan. The judgment further declares CIF bylaws 510 (undue influence) and 1100 et seq. (review of eligibility decisions) unconstitutional facially and as applied under the due process clause of the California Constitution for failing to provide minimal procedural due process to those charged with violations before the rulings issue. Finally, the

---

[1] Established by secondary schools throughout the state in 1914 and legislatively recognized in 1981, CIF is a voluntary, nonprofit organization, responsible for administering interscholastic athletics in all California secondary schools by enacting and enforcing eligibility rules for participating in interscholastic athletic programs among and between the schools. (Ed. Code, §§ 33353, 35179; *Jones v. California Interscholastic Federation* (1988) 197 Cal.App.3d 751, 756-757 [243 Cal.Rptr. 271].) It is comprised of 1,230 public, private and parochial high schools organized under the direction of local school boards of education, which sponsor athletic teams in more than 30 sports with 530,000 students competing annually in thousands of competitions among CIF member schools.

judgment provides that Ryan's counsel shall recover attorney fees and costs under Code of Civil Procedure[2] section 1021.5. CIF-SDS also appeals the postjudgment order confirming that award and setting its amount at $92,029.56.

CIF-SDS, joined by amicus curiae Education Legal Alliance of the California School Boards Association, challenges the trial court's determination that the right to participate in interscholastic sports constitutes a property or liberty interest protected by the due process clause. CIF-SDS further contends that substantial evidence supports the undue influence findings and that attorney fees are not warranted under section 1021.5 because Ryan's suit was motivated by personal pecuniary gain rather than public interest and no significant benefit was conferred on a large group of persons. In their separate appeal of the postjudgment order, they assert the fees award is excessive, is unsupported by the record, and should be limited by Government Code section 800. As we shall explain, we conclude that the challenged CIF bylaws are not unconstitutional facially or as applied under the due process clauses of either the federal or the California Constitution; the CIF bylaws provided Ryan with an opportunity to be heard in a meaningful and reasonably timely fashion and thus afforded him the process he was due; substantial evidence supports the CIF-SDS's undue influence finding; and the award for attorney fees and costs is not warranted in light of our reversal of the judgment. Accordingly, we reverse the mandamus judgment in its entirety and the postjudgment order awarding $92,029.56 in attorney fees and costs.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Born on May 16, 1979, Ryan completed his 12th grade in November 1996 at St. Gregory's College (a private school providing instruction for the seventh through 12th grades) near Sydney, Australia. In early 1997, he elected to repeat the 12th grade (a practice permitted in Australia),[3] but in the United States as had his older brother Steven. He sought and received permission to do so from St. Gregory's. Desiring to attend an undergraduate American college or university, Ryan decided to repeat the 12th grade in the United States at an institution where he could obtain sufficient credits to

---

[2] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[3] Apparently, students who have completed the 12th grade may take one or more years to repeat all or any of their subjects. Upon doing so, their university entrance mark is recalculated in light of the more recent results in any repeated subjects. The more recent score is used regardless whether the student does worse upon retaking a subject.

qualify for an American school and where he could take courses specific to America to better prepare for the college entrance exams and undergraduate education generally, and to facilitate his cultural transition to America. Ryan's father, Robert, later mentioned his interest in attending school in the United States to David Moe, an assistant basketball coach at the University of Colorado, whom he met while visiting his son Steven. Moe recommended RBV. Robert Ryan then decided to have his son attend RBV before speaking to or knowing anyone at the school.

Robert Ryan telephoned the principal's office at RBV in May 1997. Due to the lateness of the hour, those individuals necessary for making arrangements for the enrollment of a foreign student were not available. Consequently, given his son had expressed interest in playing American football, he requested that he be transferred to the football coach. Coach Craig Bell advised him that RBV had a "no cut" policy, that his son's eligibility would have to be determined by the CIF, and that the counseling office would handle enrollment. Bell then reported the contact to RBV athletic director Ric Bethel. Bell later received a transcript from Robert Ryan, which he forwarded to counselor Frank Donez. After Ryan was admitted, Robert Ryan telephoned Bell, requesting his help in locating an I-20 immigration form.[4] Bell again reported this contact and request to Bethel. Neither of them had ever heard of the form. Bell then contacted Peter McHugh, assistant superintendent of the Vista Unified School District and CIF chairman of the San Diego Section. McHugh advised him that the district did not issue I-20 forms, but did enroll students with them. McHugh requested his secretary to contact Bell and advise him how to obtain an I-20 form. Upon obtaining the form, Bell forwarded it to Donez, who signed it. Robert Ryan then called Bell again to ask for his assistance in finding housing for his son. Apparently overhearing the conversation, assistant football coach Don Thomason volunteered to let Ryan reside with him. Bell called Robert Ryan back and advised him. The Ryans then contacted Thomason and confirmed the living arrangements.

On September 9, 1997, in response to RBV principal Alan Johnson's August 28th letter requesting athletic eligibility for Ryan, Jessop found Ryan ineligible for violating the eight-semester rule and the transfer rule. She reasoned:

"a. John Ryan has already completed eight semesters of school beyond his initial enrollment in the ninth grade. Our rules do not permit our own

---

[4]An I-20 form is issued by the Immigration and Naturalization Service (INS). Signed by the school, it is apparently designed to advise the INS the student has been accepted and to enable it to assign a tracking number to the student visitor. If the student comes through an established exchange program, then a similar form is utilized which the exchange program executes.

students to exceed the eight semester rule without a documented hardship. John Ryan indicated he has suffered no hardship in the past four years. Our rules do not permit students in foreign exchange programs to exceed the eight semester rule. I cannot, in good conscience, apply lesser criteria to John.

"b. As a student in this country on an I-20 visa, John is subject to the same basic transfer rule as any other student. If he transfers schools without a corresponding change of residence on the part of his family, he is ineligible (at the varsity level) for 12 calendar months from the date of the transfer." Following unsuccessful internal CIF appeals, Ryan petitioned for administrative mandamus. On December 24, Superior Court Judge Robert O'Neill issued a writ of mandamus directing CIF-SDS to rescind its September 9 order denying Ryan athletic eligibility, because the record lacked substantial evidence supporting the reasons given for the denial and further did not reflect Ryan was considered for a possible waiver of the transfer rule. Of relevance here, the court specifically found there was not substantial evidence supporting the contention Ryan sought to repeat the 12th grade for athletic purposes or that there existed an athletic motivation for that decision. Rather, the record showed his reason for repeating the 12th grade, regardless whether in Australia or California, was to obtain enough credits to receive a college education in America.

While the cited proceedings were pending, Jessop issued a third Ryan ruling on October 2, finding RBV, and specifically Coach Bell, had violated CIF bylaw 510[5] prohibiting school personnel from inducing a student to enroll in or transfer to a particular school for athletic purposes. The ruling rendered Ryan ineligible to participate in high school sports for one year.

---

[5]CIF bylaw 510, entitled "Undue Influence," provides: "A. The use of undue influence by any person or persons to secure or retain a student or to secure or retain one or both parents or guardians of a student as residents may cause the student to be ineligible for high school athletics for a period of one year and shall jeopardize the standing of the high school in the California Interscholastic Federation. [¶] NOTE: Undue influence is any act, gesture or communication (including accepting material or financial inducement to attend a CIF member school for the purpose of engaging in CIF competition regardless of the source) which is performed personally, or through another, which may be objectively seen as an inducement, or part of a process of inducing a student, or his parent or guardian, by or on behalf of, a member school, to enroll in, transfer to, or remain in, a particular school for athletic purposes. [¶] B. A student shall become ineligible for CIF competition in their respective sport and shall be penalized according to Bylaw 400 for accepting material or financial inducement to attend a CIF member school for the purpose of engaging in CIF competition, regardless of the source."

Ryan appealed this undue influence ruling, which was confirmed by a CIF appellate panel on October 13. However, the review panel reduced the period of suspension from one year to 13 days. On June 30, 1998, relying on a significant amount of new evidence, Ryan sought reconsideration, which was denied on October 28.[6] After an unsuccessful appeal to state CIF executive director John J. Hayes, Ryan filed his mandamus action on February 25, 1999. His first amended petition and complaint was filed on July 12, alleging causes of action for declaratory relief and alternative and peremptory writs of mandate. On August 2, 2000, Superior Court Judge Ronald Prager entered judgment for Ryan, directing CIF-SDS to vacate its undue influence ruling, declaring CIF bylaws 510 and 1100 et seq. unconstitutional facially and as applied under the due process clause of the California Constitution for failing to provide minimal procedural due process to those charged with violations before the rulings issue, and awarding Ryan's counsel attorney fees and costs under section 1021.5. On October 27, the trial court awarded Ryan $92,029.56 in attorney fees and costs. CIF-SDS separately appealed the mandamus judgment and the order awarding attorney fees and costs. CIF-SDS's stipulated request to consolidate these appeals was denied on December 13. After further review, however, this court ordered the appeals consolidated for purposes of oral argument and disposition.[7]

II.

## The Challenged CIF Bylaws Are Not Unconstitutional Facially or as Applied Under the Due Process Clause of Either the Federal or California Constitution

 CIF-SDS, joined by amicus curiae, challenge the trial court's ruling that the CIF bylaws are unconstitutional facially and as applied in violation

---

[6]The appellate committee chair and one of the two other committee members reviewed all the materials presented in Ryan's appellate packet submitted with his motion for reconsideration and found no reason to reconvene the panel.

[7]While these proceedings pertaining to Ryan's eligibility were pending, the Vista Unified School District fired coach Bell based on Jessop's undue influence ruling. On October 24, 1997, another department of the superior court issued a temporary restraining order staying Bell's termination as head football coach. Following trial, the court found the school district had violated the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) (Brown Act), directed it to nullify its prior decision terminating him and permanently enjoined it from enforcing its termination decision. The court also awarded Bell reasonable attorney fees and costs under Government Code section 54960.5. In *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672 [98 Cal.Rptr.2d 263], we affirmed the judgment insofar as it related to the Brown Act violation, but reversed it as to the attorney fees and costs award, and remanding with directions the trial court recalculate the award following reasonable apportionment.

of the due process clause of the California Constitution (Cal. Const., art. I, §§ 7, 15). The trial court specifically found CIF bylaws 510 and 1100 through 1103, "pertaining to student eligibility to participate in interscholastic athletics[,] are unconstitutional . . . [for] fail[ing] to provide involved parties and students, who are charged with violations affecting eligibility, or who stand to lose eligibility as a consequence of a CIF decision, minimal procedural due process (namely oral or written notice of the charges, and if they are denied, an explanation of the evidence the authorities have in support of the charges and, if requested, an opportunity to present their side of the story), before the deprivation occurs." In doing so, the trial court expressly found that the right to participate in interscholastic athletics constitutes a "property interest" protected by the state Constitution, invoking its procedural due process guarantees. CIF-SDS and amicus curiae challenge this finding, contending the trial court's ruling is thus predicated upon a fundamentally erroneous legal premise that a high school student has a property or liberty interest in participating in interscholastic athletics sufficient to invoke the due process clause of the California Constitution. They explain that the due process issue does not arise unless the students have such a property or liberty interest in participating in interscholastic sports in the first place.

However, by applying this analytical method, which is used to determine whether the federal due process protections (U.S. Const., 5th & 14th Amends.) are invoked both below and initially on appeal, the trial court and the parties failed to recognize that a different analytical approach is used to determine whether the California Constitution due process protections apply. We requested the parties to supplementally brief the issue applying the analytical approach used by California courts to determine whether the state Constitution due process protections apply. Consequently, because this is a matter of first impression in California and because the trial court and the parties applied the federal analytical approach, we likewise utilize that approach in determining whether California students have a constitutional protectable interest in participating in interscholastic sports under the federal Constitution. Consistent with the holdings of virtually every court that has addressed the issue, we conclude they do not. Since the trial court intended to analyze this matter within the context of the due process protections of the California Constitution, we additionally apply that analytical approach and conclude that Ryan has not established a statutorily, conferred benefit in

participating in extracurricular activities and specifically interscholastic sports warranting invocation of state constitutional due process protections. Further, we conclude he nevertheless received the process he was due under the circumstances.[8]

[8]The CIF decisional and appellate process is essentially as follows: The primary responsibility for determining student eligibility rests with each member school, generally with each secondary school principal. (CIF bylaw 302; CIF-SDS bylaws, art. II, A.) Occasionally upon the request of a member school, the CIF may investigate and assist school administrators in making individual eligibility determinations. In order to achieve fair and consistent eligibility determinations among member schools throughout the state, CIF functions as the final arbiter of such determinations and requests for waivers of CIF rules by hearing appeals from those who may wish to challenge a school's initial determination in a particular case or cases. The rules governing such appeals are contained in article 11 of the CIF bylaws.

Statewide, CIF is divided into 10 sections or regions, as each may establish its own procedures for handling initial student eligibility determinations. However, most sections require its commissioner to make that determination informally, based upon information provided in the first instance by school officials. The CIF bylaws require that eligibility decisions be "based upon the merits of the case within the guidelines of CIF bylaws," necessarily implying these initial rulings are predicated upon sufficient informal investigation revealing a reasonable factual basis for the determination. (See, e.g., CIF-SDS bylaws 203, 205, 214 & 220.) For example, in CIF-SDS, Jessop, as commissioner, is responsible for "interpreting and enforcing all CIF and CIF-SDS rules" and ruling "upon all eligibility questions." She generally makes the initial eligibility determination when requested to do so by a member school based upon that school's written request containing relevant factual information as to the eligibility rule to be applied. Implicit within the commissioner's factfinding responsibility, Jessop where necessary, may also interview or otherwise gather additional relevant information from the student, school officials or other interested parties. After doing so, the commissioner then informs the member school of his or her determination. If the school or the student disagrees with the commissioner's initial determination, they may invoke the appellate review procedures provided by the CIF bylaws. The procedures for CIF-SDS first permit an appeal to be presented to a panel of three school or district administrators that is convened by the chair of the section's board of managers, as no members of the appeal committee may represent the league or school district from which the appeal originated. That panel must meet within five working days of the committee chair's receipt of a written appeal. The hearing is then noticed and held, at which each party to the appeal has a right to call and examine witnesses, to introduce exhibits, and to rebut any evidence offered against him or her. Upon conclusion of the hearing and the panel's deliberations, a written decision is rendered, which is to include appropriate findings of fact, determinations of the issues, and the sanction that is to be imposed or lifted, if any. That decision becomes the final determination of CIF-SDS unless its board of managers votes to reopen the case on the basis of new evidence or procedural error. The section's final decision may then be appealed to the state CIF executive director in accordance with CIF bylaw 1101. The guidelines for this latter appeal call upon the state CIF executive director to determine whether the section's decision was lawful, fraudulent or arbitrary, was consistent with CIF rules and criteria, was supported by a reasonable basis, and extended appropriate due process to the parties. When the CIF executive director determines the section's decision violates any of the guidelines, the matter may be returned to the section for further review or, if necessary, the decision may be set aside and jurisdiction over the matter assumed by the executive director. Otherwise, the decision becomes administratively final.

## A. Federal Constitutional Analysis

A student athlete is not unlike any other student entering high school and aspiring to participate in extracurricular activities, such as theater, student government, the band, the cheerleader squad, the debate team, or the chess team.[9] Amicus curiae correctly points out that the CIF-SDS's determination that a student is ineligible to compete in interscholastic sports may well upset that student's aspirations and expectations, but it does not deprive that student of a constitutionally protected right. Rather, like those students who do not qualify for one reason or another to act in a play, to serve as a class officer, or to compete or be on a specific team, a declared ineligible student like Ryan has no property interest in, and thus no due process right to, an opportunity to play on RBV's football or basketball teams. Simply stated, "[s]tudents can need, want, and expect to participate in interscholastic athletics, but students are not *entitled* to participate in them." (*Jordan v. O'Fallon Tp. High School Dist.* (1999) 302 Ill.App.3d 1070 [235 Ill.Dec. 877, 706 N.E.2d 137, 140].)

Preliminarily, we recognize that the strictures of due process apply only to the threatened deprivation of liberty and property interests deserving the protection of the federal and state Constitutions. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 332 [96 S.Ct. 893, 901, 47 L.Ed.2d 18]; *Board of Regents v. Roth* (1972) 408 U.S. 564, 569 [92 S.Ct. 2701, 2705, 33 L.Ed.2d 548]; *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 [124 Cal.Rptr. 14, 539 P.2d 774].) "When protected interests are implicated, the right to some kind of prior hearing is paramount." (*Board of Regents v. Roth, supra,* 408 U.S. at pp. 569-570, fn. omitted.) Although no California appellate decision has directly addressed whether a high school student's right to participate in interscholastic sports constitutes a property or liberty interest protected by the due process clause,[10] the federal appellate courts have made it clear that a student's participation in interscholastic athletics, like

---

[9]Ryan challenges this analogy, asserting the CIF has adopted in exhausting detail rules and understandings that govern participation in interscholastic sports, setting it apart from the analogized extracurricular activities. Ryan misses the point. If there exists a constitutionally protected right to participate in extracurricular activities generally, then upon deprivation a disappointed student could challenge the determination by asserting it was obtained without affording the student minimal procedural due process, inevitably giving rise to litigation and judicial involvement.

[10]California decisional precedents have generally held that participation in interscholastic sports is not a fundamental right under the California and United States Constitutions. In *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 9 [26 Cal.Rptr.2d 834, 865 P.2d 633], our Supreme Court held that the NCAA's (National Collegiate Athletic Association) drug testing program did not violate the state constitutional right to privacy and thus college student athletes could be required to abide by the program. In doing so, the court declared:

any other extracurricular activity, is not protected by the due process guarantee of the federal Constitution. (See, e.g., *Seamons v. Snow* (10th Cir. 1996) 84 F.3d 1226, 1235; *Niles v. University Interscholastic League* (5th Cir. 1983) 715 F.2d 1027, 1031 [in a substantive due process claim after acknowledging the due process clause applies only to fundamental rights giving rise to a legitimate claim of entitlement and does not protect lesser interests or mere expectations, the court held "[a] student's interest in participating in interscholastic athletics falls 'outside the protection of due process.' [Citation.]"]; *Hebert v. Ventetuolo* (1st Cir. 1981) 638 F.2d 5, 6 [high school students had no property right to play interscholastic sports under Rhode Island Law, had no infringed liberty interest, and thus had no constitutional entitlement to any process whatsoever]; *Walsh v. Louisiana High Sch. Athletic Ass'n* (5th Cir. 1980) 616 F.2d 152, 156, 159 ["the due process clause of the fourteenth amendment extends constitutional protection to those fundamental aspects of life, liberty, and property that rise to the level of a 'legitimate claim of entitlement' but does not protect lesser interests or 'mere expectations.' [Citations.] A student's interest in participating in a single year of interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement."]; *Denis J. O'Connell High Sch. v. Virginia High Sch.* (4th Cir. 1978) 581 F.2d 81, 84; *Moreland v. Western Pa. Interscholastic, etc.* (3d Cir. 1978) 572 F.2d 121, 123-124; *Hamilton v. Tenn. Secondary Sch. Athletic Ass'n* (6th Cir. 1976) 552 F.2d 681, 682; *Albach v. Odle* (10th Cir. 1976) 531 F.2d 983, 984-985; *Mitchell v. Louisiana High School Athletic Ass'n* (5th Cir. 1970) 430 F.2d 1155, 1157-1158.) The *Mitchell* court expressly held: "For better or worse, the due process clause of the fourteenth amendment does not insulate a

"Athletic participation is not a government benefit or an economic necessity that society has decreed must be open to all." (*Id.* at p. 42.) It further acknowledged that the students and the university "have no legal right to participate in intercollegiate athletic competition." (*Id.* at p. 43.) Similarly, in *Steffes v. California Interscholastic Federation* (1986) 176 Cal.App.3d 739, 748 [222 Cal.Rptr. 355], the court upheld CIF bylaw 214 (the transfer rule) against an equal protection challenge, declaring that the rational basis standard—not strict scrutiny—applied because "the fact that public education is a fundamental right under the California Constitution does not compel a finding that in California the right to participate in interscholastic athletics is also a fundamental right entitled to the highest degree of constitutional protection." Moreover, the court explicitly noted, with apparent approval, that other courts from Pennsylvania, New York and Mississippi, based on a procedural due process analysis, have similarly rejected the notion that participation in interscholastic athletics constitutes a property right. (*Steffes*, at p. 747.) Finally, the court in *Jones v. California Interscholastic Federation, supra,* 197 Cal.App.3d at page 757, upheld CIF bylaw 212 (the eight-semester rule) against an equal protection challenge, reaffirming the holding in *Steffes* that participation in interscholastic athletics does not involve a fundamental right sufficient to invoke strict scrutiny review standards. Granted, none of these cases involved the precise issue presented here. However, they all recognize that participation in interscholastic athletics is not a matter of constitutional dimension or right deserving special protection by the courts.

citizen from every injury at the hands of the state. 'Only those rights, privileges and immunities that are secured by the Constitution of the United States or some Act of Congress are within the protection of the federal courts. Rights, privileges and immunities not derived from the federal Constitution or secured thereby are left exclusively to the protection of the states.' The privilege of participating in interscholastic athletics must be deemed to fall in the latter category and outside the protection of due process. [Fns. omitted.]" (*Ibid.*)

 A property or liberty interest here must thus find its source in some aspect of state law. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Although property interests may take many forms, they do not, however, assume the form of an "abstract need or desire" or a "unilateral expectation" in receiving a benefit. An individual "must, instead, have a legitimate claim of entitlement to it." (*Board of Regents v. Roth, supra*, 408 U.S. at pp. 576-577 [92 S.Ct. at pp. 2708-2709]; *Skelly v. State Personnel Bd., supra*, 15 Cal.3d at pp. 206-207.)

 Neither the California Constitution nor California statutory law contains any provision that entitles students to an absolute right to participate in extracurricular activities and, precisely, in interscholastic athletics. Absent such support, the opportunity to participate in interscholastic athletic activities is a privilege, not a right or an entitlement of such dignity to warrant due process protection. Our conclusion is consistent with the overwhelming majority of other states whose appellate courts have held that students do not possess a constitutionally protected interest in their participation in extracurricular activities and, specifically, in interscholastic sports. (See, e.g., *Scott v. Kilpatrick* (1970) 286 Ala. 129 [237 So.2d 652, 656]; *L. P. M. v. School Bd. of Seminole County* (Fla.Dist.Ct.App. 2000) 753 So.2d 130, 132; *Smith v. Crim* (1977) 240 Ga. 390 [240 S.E.2d 884, 886]; *Ind. High School Ath. Ass'n v. Carlberg* (Ind. 1997) 694 N.E.2d 222, 241-242; *Ky. H. S. Ath. Ass'n v. Hopkins Cty. Bd. of Ed.* (Ky.Ct.App. 1977) 552 S.W.2d 685, 689, overruled on another ground in *National Collegiate Athletic v. Lasege* (Ky. 2001) 53 S.W.3d 77, 89; *Chabert v. Louisiana High School Athletic Ass'n* (La.Ct.App. 1975) 312 So.2d 343, 345; *Berschback v. Grosse Pointe Pub. Sch. Dist.* (1986) 154 Mich.App. 102 [397 N.W.2d 234, 243]; *Mississippi H. S. Activities v. Coleman* (Miss. 1994) 631 So.2d 768, 774; *State ex rel. Missouri St. H. S. A. Ass'n v. Schoenlaub* (Mo. 1974) 507 S.W.2d 354, 359; *Menke v. Ohio High School Athletic Ass'n* (1981) 2 Ohio.App.3d 244 [441 N.E.2d 620, 624]; *Whipple v. Oregon School Activities Ass'n* (1981) 52 Or.App. 419 [629 P.2d 384, 386]; *PA. Inter. Ath. Ass'n v. Great. Johnstown Sch.* (1983) 76 Pa.

Commw. 65 [463 A.2d 1198, 1201-1202]; *Tennessee Secondary Sch. Athletic Ass'n v. Cox* (1968) 221 Tenn. 164 [425 S.W.2d 597, 602]; *Spring Branch I.S.D. v. Stamos* (Tex. 1985) 695 S.W.2d 556, 561; *Sullivan v. University Interscholastic League* (Tex.Civ.App. 1980) 599 S.W.2d 860, 863, revd in part on other grounds (Tex. 1981) 616 S.W.2d 170; *Bailey v. Truby* (1984) 174 W.Va. 8 [321 S.E.2d 302, 315-316].)

Citing *Perry v. Sindermann* (1972) 408 U.S. 593, 601 [92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570], Ryan unpersuasively suggests the CIF bylaws regarding sports eligibility provide the rules or "mutually explicit under-standings" necessary to support his claim of entitlement to the benefit. Unlike *Perry* and *Skelly,* where the individuals claimed to have already acquired a property interest of one form or another,[11] the CIF bylaws do not purport to provide students with any right or property interest to participate in interscholastic sports. Rather, the eligibility bylaws establish the rules that determine whether a student may be eligible to participate in interscholastic athletics in the first place. (See CIF bylaws 202, 214(B) & 510.) Indeed, that is what Jessop did. Therefore, her ruling, later confirmed by CIF-SDS and CIF, that Ryan was not eligible to participate in interscholastic athletics in RBV, in response to the latter's application, did not deprive him of an already acquired right to play sports under CIF rules. Nor did her undue influence ruling that followed. Ryan has proffered no authority, and we can find none, for the proposition that the initial determination as to whether one qualifies for a particular benefit in the first instance must be preceded by a formal due process hearing.

The trial court's reliance on *Goss v. Lopez* (1974) 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725], and *Hartzell v. Connell* (1984) 35 Cal.3d 899 [201 Cal.Rptr. 601, 679 P.2d 35], for the proposition that the right to a public education creates a property interest in each of its parts, is misplaced. Within the context of total exclusion from the educational process that results from a suspension, *Goss* recognized that where state law has created a student's entitlement to a public education, that entitlement constitutes a property interest that is constitutionally protected. (*Goss v. Lopez, supra,* 419 U.S. at pp. 573-574, 576 [95 S.Ct. at pp. 735-736, 737]; see generally *Civil Service Assn. v. City and County of San Francisco* (1978) 22 Cal.3d 552, 563 [150 Cal.Rptr. 129, 586 P.2d 162].) The *Goss* court held: "Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend.

---

[11]The Supreme Court in *Board of Regents v. Roth, supra,* 408 U.S. at page 576 [92 S.Ct. at page 2708], explained: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."

Those young people do not 'shed their constitutional rights' at the school-house door. . . . Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." (*Goss v. Lopez, supra,* 419 U.S. at p. 574 [95 S.Ct. at p. 736].) However, in framing that property interest, the Supreme Court spoke generally in terms of the "educational process." (*Goss, supra,* 419 U.S. at p. 576 [95 S.Ct. at p. 737.) "The educational process is a broad and comprehensive concept with a variable and indefinite meaning. It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement. We do not read *Goss* to establish a property interest subject to constitutional protection in each of these separate components." (*Albach v. Odle, supra,* 531 F.2d at p. 985; *Seamons v. Snow, supra,* 84 F.3d at p. 1235.) We likewise decline to interpret *Goss* as recognizing a property interest in all the integral parts of the educational process, including a constitutionally protected entitlement to participate in interscholastic athletics. (*Walsh v. Louisiana High Sch. Athletic Ass'n, supra,* 616 F.2d at p. 159; see also *Haverkamp v. Unified Sch. Dist. No. 380* (D.Kan. 1986) 689 F.Supp. 1055, 1057.) Participation in interscholastic athletics, standing alone, is but one stick in the bundle of the educational process and does not rise to the level of a separate property or liberty interest to which a student is entitled and of which he or she cannot be deprived without due process. (*Menke v. Ohio High School Athletic Ass'n, supra,* 441 N.E.2d at p. 624.)

Similarly, the trial court's reliance on *Hartzell* is misplaced. There, our Supreme Court held that the imposition of fees for participation by students in extracurricular music and sports activities violated the "free school" guarantee of the California Constitution, article IX, section 5. (*Hartzell v. Connell, supra,* 35 Cal.3d at pp. 905, 911.) The court recognized that extracurricular activities constitute an integral component, indeed a fundamental ingredient, of the public educational process. (*Id.* at p. 909; see generally *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001) 531 U.S. 288, 299 [121 S.Ct. 924, 932, 148 L.Ed.2d 807].) However, the court did not declare that a student's right to a *free* public education gave rise to a property interest in the various components of that entitlement so that participation in particular extracurricular school activities constitutes a

separate constitutionally protected right.[12] We believe that an entitlement, like the state right to a *free* public education, does not necessarily create a property interest in each of its constituent parts. (Cf. generally *Campbell v. State Personnel Bd.* (1997) 57 Cal.App.4th 281, 293-294 [66 Cal.Rptr.2d 722]; *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 632 [43 Cal.Rptr.2d 774]; and *Schultz v. Regents of University of California* (1984) 160 Cal.App.3d 768, 776-777 [206 Cal.Rptr. 910], holding that an entitlement to continued employment does not create a property interest in a particular career executive assignment, administrative assignment, or job classification, respectively.) Rather, a party claiming such an interest must still establish that the interest claimed is more than a unilateral expectation or an abstract need or desire warranting constitutional due process protection.

Finally, the trial court's observation that "for many students, the possibility of obtaining a college education literally hinges on their ability to receive an athletic scholarship, and qualification for such scholarships almost always requires participation in high school interscholastic athletics" does not create a property right to such participation. To invoke procedural due process protection, an individual must have a legitimate claim of entitlement to a benefit—not simply a unilateral expectation or an abstract need. The possibility of obtaining a scholarship does not elevate participation in interscholastic athletics into an interest that due process protects, because such opportunities are themselves simply expectancies. The acquisition of a scholarship is purely speculative, contingent upon far more than simply maintaining playing privileges. For example, a scholarship is contingent upon not only the availability of the scholarship, but also the student's

---

[12]Within the context of equal protection analysis, the *Hartzell* majority neither addressed whether nor concluded that extracurricular activities are encompassed within the concept of public education as a "fundamental right." (*Steffes v. California Interscholastic Federation, supra*, 176 Cal.App.3d at p. 747.)

The trial court's suggestion that the fact that an equal protection constitutional test was applied in *Steffes* shows that participation in interscholastic athletics is a constitutionally protected right, as it is an integral component of public education, is just wrong. The fact that CIF eligibility rules must comply with equal protection guarantees provides no support for the proposition that students possess a property interest under the due process clause to participate in interscholastic sports as an integral component of public education. (*Boyle v. PIAA* (Pa. Commw. Ct. 1996) 676 A.2d 695, 702 [although the court determined there was no rational basis for a rule promulgated by an interscholastic sports association which rendered the student ineligible to play basketball for one year, that finding did not affect the court's prior determination that the student did not have a property interest in participating in interscholastic athletics under the due process clause]; see also *Denis J. O'Connell High School v. Virginia High Sch., supra*, 581 F.2d at pp. 84-85; *Mitchell v. Louisiana High School Athletic Ass'n, supra*, 430 F.2d at p. 1158.)

excelling during season, meeting certain academic and entrance exam requirements, overcoming any inference from a disciplinary record, remaining healthy, and overcoming like competitors for the same finite scholarships that are distributed by coaches in their unbridled discretion. Consequently, the opportunity to earn, or the possibility of obtaining, an athletic scholarship is too speculative to elevate participation in interscholastic sports to the level of a constitutionally protected interest. (*Jordan v. O'Fallon Tp. High School Dist., supra,* 706 N.E.2d at pp. 140-142; *Ind. High School Ath. Ass'n v. Carlberg, supra,* 694 N.E.2d at p. 241, fn. 26, and cases there cited; *Ky. H. S. Ath. Ass'n v. Hopkins Cty. Bd. of Ed., supra,* 552 S.W.2d at p. 689; *Scott v. Kilpatrick, supra,* 237 So.2d at p. 656; see *Denis J. O'Connell High Sch. v. Virginia High Sch., supra,* 581 F.2d at p. 84; see also *Farver v. Board of Educ. of Carroll County* (D.Md. 1999) 40 F.Supp.2d 323, 334 ["[e]ven recognizing that these days colleges are farm teams for the pros, and high schools are farm teams for colleges, and that, for champion athletes, certainly there could be economic consequences, the right to participate in extracurricular activities, as distinguished from the right to attend school, is not considered to be a protected interest under the Fourteenth Amendment."].)[13]

Further, the trial court's due process ruling that the CIF bylaws are facially unconstitutional is not supported by its alternative basis that liberty interests are very much at stake in CIF undue influence rulings given their effect upon reputation, honesty and integrity of those whose actions are being questioned by the CIF. Citing *Goss v. Lopez, supra,* 419 U.S. at page 574 [95 S.Ct. at page 736], the trial court found that the serious character of an undue influence charge, if left on the records of those affected, would negatively impact their "good name, reputation, honor, or integrity," as it held the CIF bylaws on undue influence facially unconstitutional for failing to provide the parties charged with undue influence violations and the students whose eligibility status will be affected by the decision minimal procedural due process. Ryan asserts the undue influence ruling impacted him by denying him eligibility and implicating him in a recruiting scandal that led to the firing of Coach Bell, the placing of the entire athletic program at RBV on probation for one year, and the publishing of over 100 stories in the local media. It is settled that Ryan cannot state a procedural due process claim relying solely on the damage to his reputation or standing in the community allegedly the result of CIF conduct. (*Seamons v. Snow, supra,* 84 F.3d at p. 1235.) In *Paul v. Davis* (1976) 424 U.S. 693, 701 [96 S.Ct. 1155,

---

[13]Moreover, considering the hypothetical scenarios the trial court's ruling would inevitably pose, we are not inclined to place the schools, CIF and ultimately the judiciary in the untenable position of evaluating the reasonableness of each student's aspirations and expectations, regardless of the extracurricular activity, before making any decision that could conceivably compromise them.

1160-1161, 47 L.Ed.2d 405], the Supreme Court held that damage to an individual's reputation alone, apart from some more tangible interest such as employment, is insufficient to establish a due process violation. (See also *Siegert v. Gilley* (1991) 500 U.S. 226, 233 [111 S.Ct. 1789, 1793-1794, 114 L.Ed.2d 277]; *Phelps v. Wichita Eagle-Beacon* (10th Cir. 1989) 886 F.2d 1262, 1268-1269; accord, *Haight v. City of San Diego* (1991) 228 Cal.App.3d 413, 418 [278 Cal.Rptr. 334]; *Murden v. County of Sacramento* (1984) 160 Cal.App.3d 302, 308 [206 Cal.Rptr. 699].) The right to participate in interscholastic sports has not obtained in this state a constitutional status through recognition and protection under state law permitting it, combined with damage to one's reputation, to invoke the procedural guarantees in the due process clause of the Fourteenth Amendment. (See generally *Paul v. Davis*, *supra*, 424 U.S. at pp. 701-712 [96 S.Ct. at pp. 1160-1166].) Given Ryan cannot rely on the term of his athletic ineligibility,[14] the harm to his reputation alone is insufficient to warrant due process protection. (*Seamons v. Snow*, *supra*, 84 F.3d at p. 1235.) Moreover, we question the evidentiary basis for Ryan's claim his reputation suffered as a result of any undue influence conduct by others. It was never alleged that he had engaged in any wrongdoing or violated the rule; Jessop's finding was only that Coach Bell had violated the undue influence rule; and the CIF appeals panel agreed he had not been culpable in this regard. Finally, since the remedy mandated by the due process clause is simply an opportunity to refute the charge, he obtained, in any event, all that procedural due process requires during the CIF appeal process, which provided him an opportunity to clear his name, to challenge his athletic ineligibility, and to refute any inference as to him accompanying the undue influence charge as to others. (See *Murden v. County of Sacramento*, *supra*, 160 Cal.App.3d at pp. 308, 310, citing plurality opinion in *Arnett v. Kennedy* (1974) 416 U.S. 134, 157 [94 S.Ct. 1633, 1645-1646, 40 L.Ed.2d 15].)

Although Ryan had no constitutionally protectable property or liberty interest entitling him to due process, he was nevertheless provided an adequate opportunity to be heard in a meaningful and reasonably timely fashion. The CIF bylaws pertaining to student eligibility endeavor to balance the often competing interests of the student's private interest in playing interscholastic athletics and the broader mission of the CIF to promote equitable competition. They provide that the primary responsibility for determining student eligibility rests with each member school, normally the

---

[14]Actually, Ryan never lost a day of eligibility as a result of the undue influence determination and 13-day ineligibility period, because he had previously been found to be ineligible to participate in interscholastic athletics for a year under the eight-semester and foreign student transfer rules—a ruling still pending and effective at the time.

principal. Where an eligibility issue arises or a school requests guidance and a determination of eligibility, the CIF section commissioner shall decide the matters "based upon the merits of the case within the guidelines of CIF Bylaws." This necessarily implies that the commissioner only rules after a sufficient informal investigation revealing a reasonable factual basis for his or her eligibility determination. The CIF bylaws then provide for a reasonably swift appellate process, including the opportunity for a full evidentiary hearing before an appellate panel convened within five days of receipt of the written appeal and required to render its decision within two days of completing the hearing, before finality attaches to any eligibility decision.[15] In addition, appeals of final decisions can be made to the state CIF executive director. (See *ante*, fn. 8.)

Within the context of the undue influence ruling, the inquiry by Jessop arose during her review of RBV's original *request* for a declaration of Ryan's athletic eligibility. Ryan mischaracterizes the facts in asserting Jessop's ruling amounted to a *revocation* of eligibility. It did not. Within the proper context, it was a denial of a *request* for eligibility. Regardless whether Bethel provisionally permitted Ryan to practice on August 20, 1997, or simply passively did not interfere with his doing so, Ryan's practice with the team was tentative pending Johnson's August 28 request of Jessop to determine that Ryan was eligible. Jessop denied that request on September 9. During that review, she considered the information provided by the school, interviewed Ryan, and issued her written decision of that date with notice to both Ryan and school authorities. In that ruling, she expressly provided notice of her undue influence inquiry and the potential ground (securing living accommodations) underlying that charge. After so advising Ryan and the school that she was going to investigate the undue influence issue further, she conducted additional interviews and issued her undue influence ruling on October 2. After both rulings, Ryan exercised his right to obtain

---

[15]Ryan asserts there are no meaningful time constraints in the CIF administrative process. We beg to differ. Timely invocation of the process by school officials and students minimizes the potential consequences of CIF determination on all concerned parties. Early preseason school athletic eligibility requests permit more timely initial rulings and appeals, obtaining finality as swiftly as possible under the circumstances. Here, although Bethel tentatively permitted Ryan to play on August 20, 1997, the official eligibility request by Johnson to Jessop was not dated until August 28. Mindful of the intervening Labor Day weekend, she conducted her informal investigation and issued her ruling in a timely fashion on September 9, 12 days after the date of the request. On September 26, the appellate panel sustained her ruling and on October 21, CIF executive director Hayes did so as well.

As to the October 2 undue influence ruling, Ryan timely appealed that decision and it was sustained by the appellate panel 11 days later on October 13. Ryan then elected to pursue additional discovery and reconsideration before seeking final administrative review by CIF executive director Hayes.

review of Jessop's determinations in full evidentiary hearings held before impartial appellate panels convened by the chair of the CIF-SDS board of managers, as well as review by the state CIF executive director. The appeal hearings were held within five days of the panels' receipt of Ryan's written appeals, as the panels' decisions were rendered immediately upon conclusion of the hearings, following open and public deliberations. Again, within the context of the undue influence ruling, the trial court acknowledged that the appellate process that followed it was consistent with minimal procedural due process, as Ryan was given notice of the ruling, was entitled to and had legal representation, and was provided the opportunity to present evidence on his behalf and to confront the evidence against him. Confronted by a parallel process, the Indiana Supreme Court found no evidence the student was denied the procedure he was due. (*Ind. High School Ath. Ass'n v. Carlberg, supra,* 694 N.E.2d at p. 241.) Moreover, Ryan was afforded the opportunity to conduct further discovery after the undue influence appeal panel's decision and proffer additional evidence in his motion for reconsideration to that panel which considered the evidence before denying the motion. Under the circumstances presented here, Ryan was provided the process to which he was due.

Relying on the trial court's finding that CIF-SDS breached CIF bylaw 1101(A), Ryan argues that that bylaw imposes an obligation on CIF-SDS to provide due process and that it breached that duty by failing to provide him with any due process before the October 2 undue influence ruling. The assertion is unavailing. Bylaw 1101 governs appeals of final eligibility decisions to the state CIF executive director where the appellant believes that the CIF section violated one or more of the listed procedural guidelines; the first of which, (A), poses the question of whether the decision or action was lawful, providing an example of whether the section had extended appropriate due process to the parties. In other words, the provisions read together simply direct the executive director to consider whether the CIF section's decision was lawful, leaving the decision of what that means to the executive director. CIF bylaw 1101 does not provide students with an independent right to due process consistent with the procedural due process guarantees of the federal and California Constitutions. Indeed, the trial court did not hold to the contrary. It simply faulted the executive director for failing to consider whether appropriate due process was extended to the parties within the context of affording minimal procedural due process *before* Jessop's ruling issued consistent with its procedural due process findings. The trial court expressly found the appellate committee hearing convened to consider the undue influence ruling did in fact comport with minimal procedural due process, in that Ryan was given notice of the ruling,

an opportunity to present evidence on his behalf, and to confront the evidence against him.

## B. State Constitutional Analysis

 Our state due process constitutional analysis differs from that conducted pursuant to the federal due process clause in that the claimant need not establish a property or liberty interest as a prerequisite to invoking due process protection. (*People v. Ramirez* (1979) 25 Cal.3d 260, 263-264 [158 Cal.Rptr. 316, 599 P.2d 622]; *Smith v. Board of Medical Quality Assurance* (1988) 202 Cal.App.3d 316, 327 [248 Cal.Rptr. 704].) Focused rather on an individual's due process liberty interest to be free from arbitrary adjudicative procedures (*People v. Ramirez, supra*, 25 Cal.3d at pp. 263, 268), procedural due process under the California Constitution is "much more inclusive" and protects a broader range of interests than under the federal Constitution (*San Jose Police Officers Assn. v. City of San Jose* (1988) 199 Cal.App.3d 1471, 1478 [245 Cal.Rptr. 728], superseded by statute as stated in *Knapp v. City of Gardena* (1990) 221 Cal.App.3d 344, 347-348 [270 Cal.Rptr. 524]; Asimow, Toward a New California Administrative Procedure Act: Adjudication Fundamentals (1992) 39 UCLA L.Rev. 1067, 1085-1086). According to our Supreme Court, it "has expanded upon the federal analytical base by focusing on the administrative process itself." (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 564 [216 Cal.Rptr. 367, 702 P.2d 525].) In *People v. Ramirez, supra*, 25 Cal.3d at pages 263-264, our Supreme Court held that application of the due process clauses of the California Constitution "must be determined in the context of the individual's due process liberty interest in freedom from arbitrary adjudicative procedures. Thus, when a person is deprived of a statutorily conferred benefit, due process analysis must start not with a judicial attempt to decide whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." (Accord, *In re Jackson* (1987) 43 Cal.3d 501, 510 [233 Cal.Rptr. 911, 731 P.2d 36]; *Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 81, fn. 12 [177 Cal.Rptr. 566, 634 P.2d 917].)[16] The *Ramirez* court instructed the state courts to " 'evaluate the extent to which procedural protections can be

---

[16]The *Ramirez* majority modified the state analytical approach because it was troubled by the possibility in other cases where the statute under scrutiny did not protect an interest by specifying that its loss was subject to the happening of some condition, the state could define it out of the due process clause by simply providing that it is subject to the unconditional discretion of the party in charge of its administration regardless of the extent of "grievous loss" or "substantial adverse impact" that might result. (*People v. Ramirez, supra*, 25 Cal.3d at p. 266.) Consequently, the court concluded the federal analytical approach for determining

tailored to promote more accurate and reliable administrative decisions in light of the governmental and private interests at stake' rather than relying 'on whether or not the state limits administrative control over a statutory benefit or deprivation by the occurrence of specified conditions. . . .' " (*Saleeby v. State Bar, supra,* 39 Cal.3d at pp. 564-565, quoting *People v. Ramirez, supra,* 25 Cal.3d at p. 267.) The *Ramirez* court further held that "the due process safeguards required for protection of an individual's statutory interests must be analyzed in the context of the principle that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty. [Citation.] This approach presumes that when an individual is subjected to deprivatory governmental action, he always has a due process liberty interest both in fair and unprejudicial decision-making and in being treated with respect and dignity." (*Id.* at p. 268.)[17]

---

whether a due process liberty interest is at stake thus fails to take in account that " '[t]he touchstone of due process is protection of the individual against arbitrary action of government' " and to give adequate weight to the important due process value of promoting accuracy and reasonable predictability in governmental action that deprives individuals of statutory interests. (*Id.* at p. 267.)

[17]*Saleeby v. State Bar, supra,* 39 Cal.3d 547, appears to be the only case where our Supreme Court applied the *Ramirez* analytical approach within a context where no similar claim could have been made under the federal analytical approach. That is, within a context where the state law grants the governmental decision maker seemingly unconditional discretion to deprive an individual of a statutory benefit or interest. In *Saleeby,* the plaintiff claimed monetary damage caused by his attorney and sought compensation from the Client Security Fund of the State Bar (CSF). Business and Professions Code section 6140.5 authorizes the bar to create the CSF and confers complete discretion upon it to administer the CSF and to determine who is entitled to compensation. Consequently, under the federal analytical approach the statute conferred no property or liberty interest sufficient to invoke the procedural protections of the due process clause, while under our state analytical approach the individual nevertheless retained a liberty interest in being free of arbitrary adjudicative procedures in order to ensure the decision maker (the State Bar) acted within its discretion in a nondiscriminatory and nonarbitrary manner. (*Saleeby v. State Bar, supra,* 39 Cal.3d at p. 568.)

In *Saleeby,* the court found the bar's existing procedures did not comport with due process because they did not give claimants an opportunity to respond to the bar's proposed disposition or an explanation of the basis for its decision to reject the claim in whole or in part. Although the court held the bar is not required to hold a formal hearing, it concluded that in order to comport with due process, applicants must be afforded an opportunity to be heard and respond to the bar's proposed disposition of the request for reimbursement, while the bar must issue sufficient findings to afford meaningful review. (*Saleeby v. State Bar, supra,* 39 Cal.3d at pp. 565-567.)

Here, unlike *Saleeby,* the CIF processes for determining athletic eligibility are not arbitrary. Rather, they constitute an elaborate system to provide students and interested parties the right to respond and challenge the high school principal's or the section commissioner's initial, informal eligibility determination in a formal hearing conducted by an impartial three-person appeal panel, in which the party has the right to be represented by counsel, to call and examine witnesses, to introduce written documents and exhibits, and to rebut the evidence offered against him or her. Upon conclusion, the panel must render a written decision, including findings of fact, legal determinations and any proposed penalties. This final section

Although under the state due process analysis an aggrieved party need not establish a protected property interest, the claimant must nevertheless identify a statutorily conferred benefit or interest of which he or she has been deprived to trigger procedural due process under the California Constitution and the *Ramirez* analysis of what procedure is due. (*People v. Ramirez, supra,* 25 Cal.3d at pp. 264, 266, 268; *Schultz v. Regents of University of California, supra,* 160 Cal.App.3d at p. 786; see also *In re Jackson, supra,* 43 Cal.3d at p. 510, fn. 8; *Nichols v. County of Santa Clara* (1990) 223 Cal.App.3d 1236, 1246 [273 Cal.Rptr. 84]; *San Jose Police Officers Assn. v. City of San Jose, supra,* 199 Cal.App.3d at p. 1479.) The "requirement of a statutorily conferred benefit limits the universe of potential due process claims: presumably not every citizen adversely affected by governmental action can assert due process rights; identification of a statutory benefit subject to deprivation is a prerequisite." (*Schultz v. Regents of University of California, supra,* 160 Cal.App.3d at p. 786.)

■ Once triggered, " '[u]nder the California Constitution, the extent to which procedural due process is available depends on a weighing of private and governmental interests involved. The required procedural safeguards are those that will, without unduly burdening the government, maximize the accuracy of the resulting decision and respect the dignity of the individual subjected to the decisionmaking process. Specifically, [as set forth in *People v. Ramirez,*] determination of the dictates of due process generally requires consideration of four factors: the private interest that will be affected by the individual action; the risk of an erroneous deprivation of this interest through the procedures used and the probable value, if any, of additional or substitute safeguards; the dignitary interest of informing individuals of the nature, grounds and consequences of the action and of enabling them to present their side of the story before a responsible governmental official; and the government interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. [Citations.]' " (*Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 390, 391 [84 Cal.Rptr.2d 466, 975 P.2d 663], quoting *Rodriguez v. Department of Real Estate* (1996) 51 Cal.App.4th 1289, 1297 [59 Cal.Rptr.2d 652], fn. omitted; *People v. Ramirez, supra,* 25 Cal.3d at p. 269.) Comparatively, other than the addition of the dignity factor, the *Ramirez* balancing test for determining what procedural protections are warranted, given the governmental and private interests involved, is essentially identical to that employed under the federal analysis. (Cf. *Mathews v.*

determination can be appealed to the state CIF executive director for further review as previously described. This process is markedly different from those in *Ramirez* and *Saleeby* where neither the patient-inmate nor the CSF claimant was provided the opportunity to respond to the director's or bar's proposed action before final decision.

*Eldridge, supra,* 424 U.S. at pp. 335, 347-349 [96 S.Ct. at pp. 903, 908-910]; see Asimow, *Toward a New California Administrative Procedure Act: Adjudication Fundamentals, supra,* 39 UCLA L.Rev. at pp. 1085-1087.)

What safeguards comport with due process or what due process requires under specific circumstances varies, as not every context to which the right to procedural due process applies requires the same procedure. The primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner. Consequently, due process is a flexible concept, as the characteristic of elasticity is required in order to tailor the process to the particular need. (*People v. Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694]; *Rodriguez v. Department of Real Estate, supra,* 51 Cal.App.4th at pp. 1296-1297; *In re Conservatorship of Moore* (1986) 185 Cal.App.3d 718, 728 [229 Cal.Rptr. 875].) Thus, not every situation requires a formal hearing accompanied by the full rights of confrontation and cross-examination. (*Saleeby v. State Bar, supra,* 39 Cal.3d at p. 565.) "What due process does require is notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections. [Citation.] ' "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts.' [Citation.] The extent to which due process protections are available depends on a careful balancing of the interests at stake. [Citations.] In some instances, 'due process may require only that the administrative agency comply with the statutory limitations on its authority.' [Citation.]" (*Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 24 [83 Cal.Rptr.2d 481].)

 Here, Ryan has not identified a statutorily conferred benefit or interest of which he has been deprived invoking the procedural due process protections afforded by the California Constitution. His reliance on Education Code section 35179, subdivision (b), as conferring a statutory benefit on him and other students to play high school sports, is misplaced. That provision simply authorizes local school boards to enter into voluntary associations with each other for the purpose of governing regional or statewide interscholastic athletic programs. It is an enabling statute that provides the opportunity to form consortia or organizations to regulate and promote interscholastic athletic programs. It neither confers nor identifies the proffered benefit. In other words, it is not like Business and Professions Code section 6140.5 in *Saleeby v. State Bar, supra,* 39 Cal.3d 547, where the Legislature in its enactment authorized the creation of the CSF and conferred upon an existing entity, the bar, complete discretion in administering it and

determining who was entitled to compensation and to what extent. Although a claimant is not *entitled* to reimbursement, he or she is statutorily entitled to apply for reimbursement of pecuniary losses caused by the dishonest conduct of an active member of the bar from the CSF. As such, the provision confers a statutory interest upon a CSF claimant.

As discussed above, Ryan has a constitutional right to a *free* public education that includes *free* extracurricular activities when offered by public school districts. However, he does not have a statutorily conferred right to participate in those activities, to be on a specific athletic team, to act in a particular play, or to represent the school on an academic team, subject to deprivation only following constitutional procedural due process. Rather, the constitutional *free* school guarantee (Cal. Const., art. IX, § 5) has simply been interpreted in *Hartzell v. Connell, supra,* 35 Cal.3d at page 911, to extend to all publicly offered educational extracurricular activities. The court recognized that such activities constitute an integral and fundamental component of public education. (*Id.* at p. 909.) In other words, students cannot be denied the right to participate in extracurricular activities sponsored by public high school districts because of an inability to pay a fee. Thus, the court held that the imposition of fees for educational activities offered by public high school districts violates the *free* school guarantee. (*Id.* at p. 913.)

Moreover, as explained in our federal analysis, the recognized fundamental right to an education does not give rise to a constitutionally protected conferred benefit to every minute component of the educational process. To conclude otherwise would entitle a student to invoke state constitutional procedural due process protections upon the suffering of any educational disappointment, whether it be the failure to make a varsity squad, to obtain an acting role in a school theatrical production, or to represent the school on an academic team. Such an interpretation would not only defeat the limiting role of the requirement of a statutorily conferred benefit to trigger procedural due process protections, but it would also invite unbridled legal and judicial interference with the educational process to the detriment of the process and the youth that it serves. Neither consequence is reasonable or desirable. (See *Schultz v. Regents of University of California, supra,* 160 Cal.App.3d at p. 786.)

Even if we were to assume the state constitutional procedural due process analysis is triggered here, the *Ramirez* factors would not lead us to conclude that imposing the procedural requirements suggested by the trial court is warranted, but rather the established CIF decisional process is facially valid and that Ryan received the process he was due. A student's interest in

participating in extracurricular activities and specifically interscholastic sports is not trivial and is rather fleeting considering the brevity of the "seasons." Participation in extracurricular activities is an integral part of public education. However, it pales in comparison to those interests (i.e., an employee's interest in retaining one's job or a welfare recipient's interest in continuing to receive payments) that historically have required predeprivation hearings, or the process suggested by the trial court here.[18] Moreover, this individual interest does not meaningfully exist alone, as its inherent value is predicated upon the availability of fair competition through the participation of others. Thus, balanced against this private interest is CIF's interest in the eligibility decision that extends well beyond the concerns of an individual student's desire to participate on a particular athletic team. Consistent with its statutory charge, CIF's eligibility rules and resulting decisions are inextricably intertwined with its goal of obtaining fairness in competition between and among all schools in the state. CIF regularly monitors leagues for competitive balance and age and residency requirements, while providing a parallel competitive format (varsity plays varsity, etc.) in order to ensure fair, safe and competitive play—the underlying goals of its eligibility and undue influence rules. If a student is allowed to play and later determined to be ineligible, then the competitions he participated in will be deemed unfair, requiring his school to forfeit any victories even though it might have been able to achieve them without the student's participation. Such forfeitures affect all the players on the ineligible student's team. CIF member schools have joined together to establish the eligibility rules in their common interest of promoting equitable and sportsmanlike competition. Indeed, they have a significant conjoint interest in having those rules enforced even to the occasional detriment of an individual student who seeks to challenge the initial determination by the commissioner. (Cf. *Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at p. 43.)

Given the established CIF decisional and appellate procedures set forth in its bylaws (see *ante*, fn. 8) and the notice given and informal investigation pursued by commissioners generally and Jessop specifically before rendering her initial rulings on September 9 and October 2, 1997, the risk of erroneous deprivation of the cited student interest is remote. The CIF bylaws set forth a decisional and appellate process appropriately graduated to minimize the risk of erroneous decision while encouraging the most expeditious resolution of disputes. The great majority of eligibility determinations are routine and made based solely upon the written documentation provided

---

[18]As to any stigma potentially attaching to a student involved in an undue influence ruling, we have already commented that such should not normally be the case and was not so here.

to the commissioner with the initial request for determination, or with a minimal amount of additional factfinding by the commissioner through informal interviews and the like. Consequently, there is little to be gained in terms of promoting accuracy of the decisionmaking process in the vast majority of cases by requiring more formal procedures be employed at the initial stage of the process. To the contrary, imposing additional procedural safeguards at this stage will, in most cases, only add delay and expense to the process, prejudicing those students who wish to obtain eligibility clearance or waiver to play as quickly as possible.

Here, everyone was on notice of the eligibility request and all concerned parties were advised in that ruling that an undue influence inquiry was going to be pursued and why. Jessop's investigation before her ruling obtained information from Ryan's high school principal, high school athletic director and the school district assistant superintendent. Both Ryan and RBV had the opportunity to fill out the written eligibility request and Ryan was interviewed before Jessop made either ruling. Nothing prevented Ryan or RBV from providing additional information to Jessop before her ruling. Timely invocation of the CIF decisional and appellate processes is crucial in order to safeguard as much as possible the individual student's private interest. The CIF bylaws are reasonably time-sensitive, consistent with the demands of due process once invoked, but school administrators and commissioners must be vigilant in making timely eligibility requests and rulings respectively. Needless to say, early preseason school eligibility requests permit more timely initial rulings and appeals, obtaining finality as swiftly as possible while minimizing the effect of such decisions. Such was done here. However, whenever evidence of undue influence surfaces, commissioners are required to investigate and make a determination as quickly as possible. That response is dictated by the compelling CIF interest in obtaining equitable competition among all member schools. Consequently, under such circumstances, timely unhampered initial rulings based upon sufficient informal investigation revealing a reasonable factual basis for the determination protects the interests of all third parties affected by the ruling.

With regard to the probable value of additional or substitute procedural safeguards, it is undeniable that the predeprivation process suggested by the trial court that advises those involved of the pertinent evidence against them and provides them with the opportunity to offer contravening evidence and to present their side of the story, *could* enhance the accuracy and reliability of the commissioner's decision while accommodating the dignitary interests of those involved. (See *People v. Ramirez, supra,* 25 Cal.3d at pp. 264, 268-269, 275; *San Jose Police Officers Assn. v. City of San Jose, supra,* 199

Cal.App.3d at p. 1484.) However, such a predeprivation process here would impose on CIF and its member schools the significant administrative and costly burden of providing such "hearings" in potentially all cases, while creating the opportunity for students to use the system for purposes of delay by requesting such predeprivation process to temporarily preserve eligibility to permit them to play. Given that a relatively small percentage of CIF commissioners' initial eligibility determinations are challenged and require formal hearings be convened before CIF section appellate panels, the cost of providing the suggested predeprivation process in all cases before the commissioners' initial determinations would be significant. Additionally, delay jeopardizes the interests of others. As summarized above, the potential sanctions that would be imposed upon a school and its team for playing a later declared ineligible student militates against such predeprivation hearings. Further, as evident from what transpired here, the CIF process provided adequate notice to all involved parties, satisfying the dignity factor of the *Ramirez* analysis. Moreover, the trial court acknowledged, and we confirm, the CIF appeal procedures are entirely consistent with due process, as they are timely invoked within five days of a written request. Consequently, considering CIF's statutory charge and its decisional and appellate processes already in place, the balancing of these factors persuade us there does not exist sufficient justification for imposing the additional administrative burden of providing the predeprivation process suggested by the trial court on CIF and that its current processes comport with state procedural due process guarantees.

## III.

### SUBSTANTIAL EVIDENCE SUPPORTS CIF-SDS'S UNDUE INFLUENCE RULING

CIF-SDS contends the trial court erred in concluding that the administrative record lacks substantial evidence supporting its undue influence ruling. Rather, CIF-SDS asserts that its finding that undue influence was exercised by RBV personnel in facilitating Ryan's enrollment at RBV is amply supported by the administrative record, which shows that coach Bell and his RBV staff (with the aid of other RBV personnel) improperly assisted Ryan in violation of CIF bylaw 510 by providing him his living arrangements and obtaining his INS I-20 form so as to secure his enrollment at RBV. Our review of the administrative record persuades us that CIF-SDS's finding of undue influence is supported by substantial evidence.

The trial court applied the substantial evidence test in reviewing the CIF-SDS undue influence ruling.[19] ■ That is, when the underlying administrative decision does not involve or affect a fundamental vested right, the trial court reviews the entire administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law. (*International Brotherhood of Electrical Workers v. Aubry* (1996) 42 Cal.App.4th 861, 868 [50 Cal.Rptr.2d 1]; *301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.* (1991) 228 Cal.App.3d 1548, 1556 [279 Cal.Rptr. 636]; § 1094.5, subd. (c); Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶¶ 8:127 to 8:128.2, pp. 8-58 to 8-61.) When considering all relevant evidence within the administrative record, the trial court cannot lose sight that it is for the administrative agency to weigh the preponderance of conflicting evidence, as the court may reverse an administrative decision only if, based on the evidence before the administrative entity, a reasonable person could not have reached the conclusion reached by that agency. (*Eden Hospital Dist. v. Belshé* (1998) 65 Cal.App.4th 908, 915 [76 Cal.Rptr.2d 857].) Whole record review within the context of administrative mandamus review of a final CIF ruling necessarily includes all relevant evidence presented to and considered by the appellate committee (CIF bylaw 1100(2)G, H (3)) and the state CIF executive director (CIF bylaw 1101).[20] On appeal, our function is identical to that of the trial court, as we too must determine whether substantial evidence supports the administrative decision. (*Eden Hospital Dist. v. Belshé, supra,* 65 Cal.App.4th at p. 916; *International Brotherhood of Electrical Workers v. Aubry, supra,* 42 Cal.App.4th at p. 868; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra,* at ¶¶ 8.128, 8.128.2, pp. 8-60 to 8-61.)[21] This deferential standard requires us to presume the correctness of the administrative ruling, as all reasonable doubts must be resolved

---

[19]The parties initially agreed that the governing standard of review was substantial evidence. However, Ryan changed his mind and requested the trial court exercise its independent judgment. The trial court impliedly denied his request, as it applied the substantial evidence test in its ruling. Ryan does not challenge this implied ruling on appeal.

[20]The administrative record here thus includes any additional evidence discovered after the hearing, but presented to the appellate panel in Ryan's motion for reconsideration, and later considered by the state CIF executive director in Ryan's appeal to him. (See generally *Penny v. Sullivan* (9th Cir. 1993) 2 F.3d 953, 957, fn. 7; *Nelson v. Sullivan* (8th Cir. 1992) 966 F.2d 363, 366; *Barbato v. Commissioner of Social Sec. Admin.* (C.D.Cal. 1996) 923 F.Supp. 1273, 1275.) Any other rule would be inconsistent with the requirement to exhaust one's administrative remedies, which by design is to permit the agency to completely perform its fact-finding function, to apply its expertise in analyzing relevant facts, and to illuminate the basis for its exercise of discretion. (2 Davis & Pierce, Administrative Law Treatise (3d ed. 1994) § 15.2, p. 309.)

[21]Where a factual finding is challenged on the ground there is no substantial evidence to sustain it, the power of the reviewing court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted,

in favor of it. (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1244 [97 Cal.Rptr.2d 467]; *Pescosolido v. Smith* (1983) 142 Cal.App.3d 964, 970 [191 Cal.Rptr. 415].)

 Preliminarily, under CIF bylaw 510, set forth in its entirety in footnote 5, *ante*, the use of undue influence by any person to secure a student may render the student athletically ineligible for one year and shall jeopardize the standing of the high school in the CIF. Undue influence is defined pertinently as "any act, gesture or communication . . . which may be objectively seen as an inducement, or part of a process of inducing a student, or his parent or guardian, by or on behalf of, a member school, to enroll in, transfer to . . . a particular school for athletic purposes." In other words, for the record to support the undue influence ruling, it must contain substantial evidence establishing that RBV personnel engaged in conduct that objectively can be seen as "inducing" Ryan (or his parents) to enroll in or transfer to RBV, a CIF member school, for athletic purposes. Within this context, to induce means to influence, persuade or prevail upon, as well as to stimulate the occurrence or cause. (American Heritage Dict. (New college ed. 1976) p. 671.)

In reaching its decision that the challenged CIF ruling was not supported by substantial evidence, the trial court narrowly focused on whether any RBV personnel took any action *to persuade or prevail upon* Ryan or his parents for him to *attend* RBV. Finding it undisputed that the idea that Ryan attend RBV originated with his parents before contacting RBV personnel and that the Ryans initiated the transfer process, the trial court concluded that neither Ryan nor his parents were or could have been induced by school personnel to attend RBV. The court then reasoned: "Thus, all that the evidence cited by [CIF-SDS] shows is that the various school personnel involved assisted [Ryan's] parents and [Ryan] to effectuate [his] transfer to the school <u>after</u> the decision that [he] attend the school had been made. Mere acts of assistance once the decision to attend has been made by the student or his parents cannot 'objectively' be viewed as evidence that anyone improperly induced the student to transfer to the school, unless, of course, the student and the parent change their minds, and were thereafter persuaded by school personnel to proceed with the transfer, which is not the case here." CIF bylaw 510 is not so narrowly drafted. Rather, its definition of undue influence includes any acts taken by school personnel to stimulate the occurrence or cause the enrollment or transfer of the targeted student.

that will support the administrative agency's determination. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528 [86 Cal.Rptr.2d 473].)

Indeed, even under its interpretation, the trial court recognized that acts of assistance made after a student or his or her parents changed their minds regarding attending a particular school would constitute undue influence. Acts of assistance prior to enrollment or effectuated transfer can be objectively construed as conduct designed to secure enrollment—to avoid the scenario of a student or his or her parents "changing their minds" regarding the student's attendance. The use of the terms "secure" and "enroll" in CIF bylaw 510 evinces a drafting intent to broadly include such conduct whenever it can be objectively construed as an inducement designed to enable or facilitate enrollment for athletic purposes. Only by such a broad stroke of the pen could the CIF effectively draw a reasonably definitive line between permissible conduct and undue influence. The greater the apparent breadth of a bylaw prohibiting conduct through the imposition of sanctions, the greater the likelihood the provision will be effective in deterring targeted conduct. Our interpretation is consistent with the clear policy underlying this rule of promoting a level playing field for all student athletes and forestalling the growing trend to professionalize high school athletics.[22] Moreover, it is reasonable in nature given the type of conduct the bylaw seeks to discourage. Finally, our interpretation is consistent with CIF's interpretation and application of CIF bylaw 510—an interpretation of a rule promulgated by CIF under its legislative mandate (Ed. Code, §§ 33353, subd. (a), 35179, subd. (b)) which under the circumstances is entitled to deference. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7, 10-11 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1105 [102 Cal.Rptr.2d 684].)

Guided by the foregoing interpretation of CIF bylaw 510, the administrative record is replete with substantial evidence supporting CIF-SDS's undue influence finding that certain RBV personnel assisted Ryan and his parents in effectuating his transfer to and enrollment at RBV for athletic purposes. The events that transpired regarding Ryan must be interpreted within the context of his family's experience with his brother Steven, who attended the

---

[22]Ryan has requested this court to strike portions of CIF-SDS's reply brief that included the testimony of El Camino High School athletic director/head football coach Herb Meyer, regarding the meaning of undue influence and its application in this matter from the related case of *Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033 [114 Cal.Rptr.2d 787]. The motion is well taken. The testimony was not part of the administrative record below and the trial court expressly denied CIF-SDS's request to have it admitted and considered in this matter. CIF-SDS has not challenged this ruling on appeal. Although we grant Ryan's motion, we emphasize that our acknowledgment of the clear underlying purpose of CIF Bylaw 510 is derived from CIF-SDS's "General Philosophy Statement," "Cardinal Athletic Principles" and CIF bylaw 11, setting forth the underlying purposes of the organization.

12th grade at a Louisiana high school and received a division 1 scholarship to the University of Colorado that was later revoked by the NCAA clearinghouse. He then attended college in Idaho for one year before returning to Australia to play professional basketball. It was his sibling's experience that persuaded Ryan to repeat his 12th grade in the United States with the intent to attend an American university or college. Ryan's father contacted University of Colorado assistant basketball coach Moe, requesting a recommendation of an American high school for his son to attend. At the RBV basketball banquet, Moe mentioned Ryan to RBV basketball coach John O'Neill and inquired whether RBV had a good football program. Mindful that Ryan expressed an interest in playing American football to his father, a reasonable inference can be drawn that Ryan's father requested a recommendation of an American high school for John to attend which had a good football program. Moe characterized Ryan as "very aggressive" to O'Neill, who told Bell, who seemed very "intrigued."[23]

Robert Ryan first spoke with Bell in May 1997. Bell advised him that his son's eligibility would have to be determined by the CIF and that the counseling office would handle enrollment. At Bell's request, Robert Ryan sent him pictures of his son standing, sitting and dunking a basketball. Coach O'Neill stated that Bell was excited that Ryan was "coming over" and that Bell showed him pictures of Ryan dunking a basketball. Although Bell denies it, O'Neill said Bell told him that he had requested Ryan's father to send him some pictures of his son doing something athletic. Robert Ryan also sent his son's school transcripts directly to Bell, rather than the admissions or counseling office. Bell forwarded them to Donez. After Ryan was admitted, his father next requested Bell to assist him in locating an I-20 immigration form in order to enroll in RBV. With the knowledge of both RBV athletic director Bethel and VUSD (Vista Unified School District) Assistant Superintendent McHugh and aid from the latter, Bell sought to comply with Ryan's father's request. He did so in spite of being advised by McHugh the school district did not issue the I-20 forms. RBV assistant football coach Dale Henry volunteered to obtain the form and did so from San Dieguito Union High School. He gave it to Bell. Bell took the form to Donez and requested him to sign it, and Donez improperly did so in blank under penalty of perjury declaring that the information, which was yet to be provided by Ryan, was true and correct. The form was sent to the Ryans, who completed and used it to obtain a student visa for John for entry into the

---

[23]Granted, coach O'Neill's deposition testimony was taken after the administrative hearing. However, it was considered by the appellate panel in denying Ryan's request for reconsideration and by CIF executive director Hayes in rejecting Ryan's later appeal to him.

United States and enrollment at RBV.[24] Ryan's father also contacted Bell requesting assistance in finding housing for his son. Overhearing the conversation, assistant coach Thomason volunteered to let Ryan reside with him. Bell called Robert Ryan back and advised him. The Ryans then contacted Thomason and confirmed the living arrangements, which required Ryan to pay for food and other household supplies but not rent. Finally, Ryan advised Jessop at his eligibility meeting that he was attending school in San Diego to not only further his education, but also to obtain an athletic scholarship.[25]

Accordingly, given this factual summary, we cannot say a reasonable person could not have reached the undue influence finding made by CIF-SDS. The administrative record is replete with acts of assistance by RBV personnel, especially coach Bell and his staff, which may be objectively construed as undue influence—that is conduct designed to secure Ryan's ultimate enrollment at RBV. Not only did coach Bell serve as the communication point person for Ryan's father and have multiple contacts with him prior to his son's enrollment, but also other RBV coaching staff provided Ryan housing and obtained for him the necessary INS I-20 form. Such substantial involvement by Bell and his coaching staff, held in the light of coach Moe's characterization of Ryan as aggressive, coach O'Neill's description of Bell's response to Ryan, Bell's request that Ryan's father send him photographs of his son, Bell's showing of the pictures to other coaches, Bell's knowledge of Ryan's multiple sport background, and Ryan's expressed partial athletic motivation, supports the reasonable inference their acts of assistance were designed to guarantee Ryan's enrollment at RBV for athletic purposes.[26] Substantial evidence thus supports CIF-SDS's undue influence ruling.[27]

---

[24]Donez and Bell testified as to the circumstances surrounding Donez's signing of the I-20 form in their depositions which were considered by the appellate panel in Ryan's motion for reconsideration and by Hayes in Ryan's appeal to him.

[25]Although Ryan's athletic motivation is not determinative of whether undue influence was applied by RBV personnel, it is nevertheless relevant—circumstantially probative of the probable nature of his father's contacts and requests of Bell, and Bell's conduct in response.

[26]The trial court's reliance on the fact that Ryan had never played American football to support its conclusion that the administrative record was devoid of any evidence the acts of assistance done by RBV personnel were "for athletic purposes" is misplaced. A naturally skilled young athlete in the disciplines of track (high jump [6'10"], long jump [24']), rugby and basketball, with an aggressive nature and a reasonable physical stature, may well catch a coach's eye as a transitional player capable of being quickly molded. It may be reasonably inferred from the deposition testimony of Bell and O'Neill that Bell was well aware of Ryan's multiple-sport background, physical stature and aggressive style.

[27]Ryan requests this court vacate the penalty of ineligibility assessed against him in the event we uphold the undue influence finding. He narrowly focuses on the absence of any culpable conduct in his part warranting the penalty. Although we acknowledge the principal

## IV.

### THE AWARD OF ATTORNEY FEES TO RYAN'S COUNSEL UNDER SECTION 1021.5 IS REVERSED

■ The trial court awarded Ryan's counsel attorney fees and costs under section 1021.5 in the mandamus judgment, later confirming that award and setting its amount at $92,029.56 in its postjudgment order. Because we reverse the judgment to the extent that Ryan prevailed, we must also reverse the postjudgment order that followed awarding attorney fees and costs to his counsel under section 1021.5. "An order awarding such fees 'falls with a reversal of the judgment on which it is based.' " (*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 220 [27 Cal.Rptr.2d 396], quoting *Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 [267 Cal.Rptr. 62].)

### DISPOSITION[28]

The judgment is reversed. The postjudgment order awarding attorney fees and costs under section 1021.5 is reversed. The parties shall bear their own costs on appeal.

Benke, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied January 23, 2002, and respondent's petition for review by the Supreme Court was denied April 10, 2002. George, C. J., did not participate therein.

---

players in the undue influence violations were VUSD employees, the deterrent effect of the penalty is instrumental in the effective enforcement of CIF bylaw 510 in discouraging undue influence. Again, we note the CIF appellate panel reduced the period of ineligibility from one year to 13 days. We deny the request.

[28]In light of our resolution of the discussed contentions and resulting disposition of the cause, we do not address CIF-SDS's remaining contentions set forth in their appeals.